**[J-58A-C-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 756 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on December 9, |
| | : | 2016, in the Court of Common Pleas, |
| v. | : | Philadelphia County, Criminal Division |
| | : | at No. CP-51-CR-0002231-2015. |
| | : | |
| TAM M. LE, | : | |
| | : | ARGUED:  September 25, 2018 |
| Appellant | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 757 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on December 9, |
| | : | 2016, in the Court of Common Pleas, |
| v. | : | Philadelphia County, Criminal Division |
| | : | at No. CP-51-CR-0002232-2015. |
| | : | |
| TAM M. LE, | : | |
| | : | ARGUED:  September 25, 2018 |
| Appellant | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 758 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on December 9, |
| | : | 2016, in the Court of Common Pleas, |
| v. | : | Philadelphia County, Criminal |
| | : | Division, at No. CP-51-CR-0002233- |
| | : | 2015. |
| TAM M. LE, | : | |
| | : | |
| Appellant | : | ARGUED:  September 25, 2018 |
| | : | |

**OPINION**

**JUSTICE TODD**                                    **DECIDED: MAY 31, 2019**

In this direct capital appeal,[1] Appellant Tam M. Le challenges the sentence of death imposed by the Philadelphia County Court of Common Pleas following his conviction by a jury of two counts of first-degree murder,[2] one count of attempted murder,[3] three counts of kidnapping,[4] three counts of robbery,[5] and one count of conspiracy.[6] For the reasons that follow, we affirm Appellant's judgment of sentence.[7]

---

[1] *See* 42 Pa.C.S. § 9546(d) (a final court order in a case in which the death penalty has been imposed shall be directly appealable to the Supreme Court); *id.* § 9711(h)(1) (sentence of death shall be subject to automatic review by Supreme Court).

[2] 18 Pa.C.S. § 2502(a).

[3] *Id.* § 901.

[4] *Id.* § 2901.

[5] *Id.* § 3701.

[6] *Id.* § 903.

[7] Also pending before this Court is the Commonwealth's "Application to File Post-Submission Communication Clarifying Position" ("Application"). By way of background, prior to oral argument of this case, the Commonwealth, on August 7, 2018, filed a motion to hold this case in abeyance pending this Court's disposition of *Commonwealth v. Lavar Brown*, No. 728 CAP, wherein the appellant raised issues regarding the administration of capital punishment in Pennsylvania. While the Commonwealth's motion was still pending, the Commonwealth filed its brief in this matter, arguing that Appellant's capital sentence should be affirmed. On August 24, 2018, another capital defendant, Jerome Cox, filed with our Court a "Petition for Extraordinary Relief Under King's Bench Jurisdiction" ("Cox Petition"), challenging the administration of capital punishment in Pennsylvania following the 2018 release of a report by the Joint State Government Commission ("Report"). *See Cox v. Commonwealth*, 102 EM 2018; *see also Marinelli v. Commonwealth*, 104 EM 2018 (seeking similar relief). Ultimately, on August 27, 2018, this Court denied the Commonwealth's motion to hold the instant case in abeyance.

On September 17, 2018, the Commonwealth again requested this Court hold the instant matter in abeyance, and further sought to postpone oral argument. *See* Commonwealth's Application to Hold Appellant's Cases in Abeyance in View of the Recently Filed Application for Extraordinary Relief under King's Bench Jurisdiction. The Commonwealth expressed concern that, were it to argue for affirmance of Appellant's sentence, that position might be "inconsistent with the position it ultimately adopts should this Court exercise jurisdiction over Cox's Petition." Application at 3. This Court denied the Commonwealth's request on September 21, 2018. At oral argument, the Commonwealth stated that, in light of the pending Cox Petition, it was not prepared to

## I. Factual and Procedural History

On August 26, 2014, Tan Voong, a/k/a Sonny Voong, received multiple telephone calls from a friend, Vu Huynh, a/k/a Kevin Huynh (hereinafter "Kevin"), asking to borrow $100,000. Kevin and his younger brother, Viet Huynh (hereinafter "Viet"), allegedly owed the money to Appellant and several of Appellant's friends from New York. Over the next four to five hours, Voong was able to gather approximately $40,000, and was instructed by Kevin to bring the money to Appellant's house on South 72nd Street in Philadelphia. Voong had met Appellant previously, and had been to his house on one prior occasion. When Voong arrived at the residence, Appellant met him outside. Voong asked where Kevin was, and Appellant led him to the garage. When Voong entered the garage, he observed Kevin and Viet seated in chairs, bound, blindfolded, bleeding, and wearing only their boxer shorts and T-shirts. He also saw four individuals with masks on their faces. Voong attempted to run, but was hit in the face with a gun. He then was stripped to his underwear and T-shirt; his hands were zip-tied behind his back; his mouth, eyes, and legs were duct-taped; and he was placed in a chair. Someone asked Voong where the money was, and Voong responded that it was in his car. Several of the masked individuals began to beat Voong, who asked for time to collect the rest of the money. Appellant responded, "It's too late," N.T. Trial, 11/14/16, at 96, and Voong, Kevin, and Viet were placed in a van and driven to a location along the Schuylkill River.

As Voong was removed from the van, he felt sand under his feet. He knelt down and felt himself being stabbed in the back, chest, and neck. Chains were strapped

---

argue for the affirmance of Appellant's death sentence. The following day, the Commonwealth filed the instant Application, in which the Commonwealth contends, contrary to its brief, that it does not now seek any specific relief, but simply states that its purpose is "to clarify that it does not argue for affirmance of the capital sentence in this case, at this time, and to explain the basis for that position." Application at 4. The Commonwealth's Application is granted, and its explanation is noted.

around his legs, and he was kicked into the water. Fortunately, the water was shallow and Voong was able to breathe. He played dead, during which time he heard Kevin and Viet scream. He then heard something heavy enter the water, after which he heard Appellant state, "It's done." *Id.* at 109. Upon hearing the van drive away, Voong rubbed his face against a wall in order to remove the duct tape that was on his eyes. He eventually dragged himself out of the water, which he was able to do because the chain had come free from his legs. At approximately 4:00 a.m. on August 27th, two police officers discovered Voong, wearing only boxer shorts and a bloody T-shirt, sitting on the side of the highway. He was wet, shivering, and bleeding from multiple stab wounds. His hands were zip-tied behind his back, and he had duct tape around his ankles and hanging from his neck. Initially, Voong told police that his name was Fathanh Voong, which, in fact, was the name of his brother, and he stated that he had been standing on a street corner when a van pulled up and he was pulled inside. He reported that his abductors stripped him, tied him up, and robbed him, and then drove him to the river, stabbed him multiple times, and threw him in the river. He also told police that two other individuals had also been thrown into the river, but he did not know them. He directed the police to the location where he believed the other individuals to be. Voong was then taken to the hospital, where it was discovered that he had eight stab wounds, two of which were life threatening.

In the area of the river that Voong identified, police found the bodies of Kevin and Viet, clothed only in boxer shorts and T-shirts. Kevin's body was found submerged under five feet of water. He had duct tape on his head, face, neck, mouth, and legs. Under the duct tape on his eyes was fiberglass mesh construction tape. He had construction zip-ties on his wrists, and nearby was a nearly-full bucket of roof cement with a chain attached. Kevin had been stabbed 24 times in the torso, legs, and head. He also had

nine cuts to his body, including four precise incisions to his face. The medical examiner was unable to determine whether Kevin died prior to being thrown in the water, or after. Viet's body was found submerged under ten feet of water. He had duct tape over his head, face, and arms. His legs were attached to a bucket of roof cement by a chain, wire ties, and duct tape. He had been stabbed in the chest, back, face, and arms. As with Kevin, the medical examiner was unable to determine whether Viet died before being put into the water.

The police conducted a videotaped interview of Voong in his hospital room at approximately 10:45 a.m. on August 27, 2014. Voong acknowledged that he previously gave the police the name of his younger brother, and described the events that occurred when he went to Appellant's house the prior evening. At trial, Voong stated that he gave the police his brother's name and date of birth when he was first found because he did not feel like he could trust anyone. *Id.* at 51. During the interview, Voong identified Appellant, whom he referred to as "Lam," from a photograph array by circling Appellant's picture.

On the morning of the following day, August 28, 2014, police officers searched Appellant's home and property, which he shared with his girlfriend, Bich Vo, their three children, and Vo's other two children. Amid a large amount of construction materials in the detached garage, police discovered buckets of roof cement attached to chains and a Walmart bag containing several pieces of rolled-up silver duct tape. The duct tape had both blood and hair on it, and subsequent testing revealed that the blood and hair contained both Kevin's and Viet's DNA.

On September 20, 2014, the police issued an arrest warrant for Appellant. By this time, however, Appellant had fled with his girlfriend and children to Delaware. According to the trial testimony of Vo, as she was leaving her house on August 26, 2014 to visit a

friend in Baltimore, she saw Appellant, Viet, and a neighbor at her house. When she returned home that evening, Appellant was not there and his green van was not in the backyard; suspecting he was with another woman, she began to call his cell phone "[a] lot." N.T. Trial, 11/16/16, at 50. Appellant never answered the calls, and Vo began sending him text messages, to which he did not reply. Vo testified that Appellant arrived home sometime during the night with a friend named "Hai." Vo testified that Appellant and Hai left for work the next day, and that, later that afternoon, she received a phone call from Hai instructing her to drive with her children to Hai's mom's house in Delaware. When Vo and the children arrived at the house, Appellant and Hai were already there, and, that same evening, Appellant, Hai, Vo, and the children all traveled to Rochester, New York. At some point, Appellant parted ways with his family; however, Vo indicated that she knew of Appellant's whereabouts, and, indeed, she and her children were with him when he ultimately was apprehended on January 13, 2015 in a hotel room in Ashland, Virginia.

Prior to jury selection, Appellant's counsel requested permission to question potential jurors regarding Appellant's prior conviction in New York for voluntary manslaughter, the equivalent to third-degree murder in Pennsylvania. The trial court denied the request.

At trial, in addition to the testimony of Voong and Vo,[8] the Commonwealth introduced the cell phone records of Appellant, Vo, Kevin, Viet, and Voong. In order to

---

[8] At trial, Vo recanted many of the statements she gave during her interview with police on December 19, 2014, including her statements that: when she arrived at Hai's mom's house in Delaware, Appellant instructed her to turn off her cell phone so that the police could not track it through GPS, N.T. Trial, 11/16/16, at 91-92; Appellant told her Kevin and Viet were killed because they owed him money, *id.* at 92; Appellant described to her how he and his accomplices stabbed Voong, Kevin, and Viet and threw them into the river, *id.* at 94; and Appellant, upon learning that one of the victims survived the stabbing, became pale and nervous and decided to leave Rochester, *id.* at 95.

authenticate the records, the Commonwealth presented the testimony of Anthony Caine, a retail sales manager for AT&T, and Dominick Kaserkie, a manager in the legal compliance department at T-Mobile, both of whom testified that the cell phone records were kept in the ordinary course of business. Agent William Shute, an expert in historical cell site analysis, testified that the call detail records established, *inter alia*, that, on August 26, 2014, Viet and Appellant exchanged numerous calls during the afternoon, and placed Viet's phone in the area of Appellant's house that evening. The records further revealed that Kevin and Viet exchanged a series of calls after 6:32 p.m. on August 26, 2014, and, between the early evening and midnight of that same day, Kevin and Voong exchanged 35 calls. The records placed Kevin's phone in the area of Appellant's house from 7:30 p.m. until at least 11:54 p.m. on August 26, 2014, and placed Voong's phone in the area of Appellant's house from 11:15 p.m. on August 26, 2014, until at least 12:20 a.m. on August 27, 2014. The records further placed Appellant's cell phone in the area of his home from approximately 7:20 a.m. until at least 5:42 p.m. on August 26, 2014; in the area of Chinatown around 7:20 p.m. on August 26, 2014; back at home until 12:27 a.m. on the morning of August 27, 2014; and then in the area of the crime scene from between 1:45 a.m. to 1:59 a.m. that same morning. The records also showed that, during this time, Vo called or texted Appellant ten times from her cell phone while she was at the residence she shared with Appellant, and that, on the following day, she traveled from Philadelphia to Delaware between the hours of 6:30 p.m. and 7:30 p.m.

Appellant testified in his own defense, claiming that Kevin and Viet had asked to borrow money from him in order to repay a debt they owed to individuals from New York. He testified that a number of people, including Viet, Kevin, and Voong came to his garage on the evening of August 26, 2014 to discuss the repayment, and that several individuals from New York tied up the brothers and Voong, but not him, and then put all four of them

in a van and drove to the river. According to Appellant, after he begged for his life, his abductors transferred him to another vehicle, took him somewhere and told him to count to 1000, and, when he was finished, he realized he was back in his garage. Appellant testified that he initially went to Delaware and New York because he was afraid for himself and his family, and was afraid he would be arrested and accused of murder.

On December 1, 2016, a jury convicted Appellant of two counts of first-degree murder; three counts of kidnapping; three counts of robbery; one count of attempted murder; and one count of conspiracy.[9] At the penalty phase of Appellant's trial, the Commonwealth introduced, *inter alia*, evidence of Appellant's prior conviction for manslaughter in New York. The jury found five aggravating circumstances with respect to both first-degree murders: (1) the victim was being held for ransom or reward, 42 Pa.C.S. § 9711(d)(3); (2) the offense was committed during the perpetration of a felony, *id.* § 9711(d)(6); (3) the offense was committed by means of torture, *id.* § 9711(d)(8); (4) Appellant had "been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable," *id.* § 9711(d)(10); and (5) Appellant had been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503, committed in another jurisdiction either before or at the time of the offense at issue. 42 Pa.C.S. § 9711(d)(12).[10] With respect to both murders, the jury found a single mitigating circumstance, the "catch-all mitigator." *Id.* § 9711(e)(8). Finding the aggravating circumstances outweighed the mitigating circumstance, the jury returned sentences of death for the murders of Kevin and Viet. Thereafter, the trial court imposed two death sentences, and a consecutive sentence of 10 to 20 years imprisonment for Appellant's conspiracy conviction relating to

---

[9] Appellant was charged with conspiracy only in connection with the first-degree murder of Kevin.

[10] Appellant incorrectly states in his brief that the jury found four aggravating circumstances. *See* Appellant's Brief at 13.

Kevin. Appellant also was sentenced to a consecutive term of 20 to 40 years imprisonment for the attempted murder of Voong. No additional sentences were imposed on Appellant's three kidnapping and robbery convictions. Appellant filed a notice of appeal, and the matter is now before this Court.

## II. Analysis

### A. Sufficiency of the Evidence

Although Appellant has not raised a claim regarding the sufficiency of the evidence, in all direct capital appeals, this Court nevertheless reviews the evidence to ensure that it is sufficient to support a first-degree murder conviction. *Commonwealth v. Poplawski*, 130 A.3d 697, 709 (Pa. 2015). In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all the reasonable inferences derived therefrom, viewed in favor of the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Smith*, 985 A.2d 886, 894-95 (Pa. 2009).

First-degree murder is an intentional killing, *i.e.,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. *Smith*, 985 A.2d at 895. The jury may infer the specific intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body. *Id.*

In addition, as it is relevant to our review of the first-degree murder convictions, in order to convict a defendant of conspiracy, the Commonwealth must prove: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) that the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in

furtherance of the agreed upon crime. *Id.* As it is often difficult to prove an explicit or formal agreement, the agreement generally is established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties, or the overt acts on the part of co-conspirators. *Commonwealth v. Johnson*, 985 A.3d 915, 920. (Pa. 2009). In the case of a conspiracy to commit homicide, each member of the conspiracy may be convicted of first-degree murder, regardless of who inflicted the fatal wound. *Id.*

Finally, an individual may be held criminally liable for the acts of another, including first-degree murder, as an accomplice. In order to sustain a conviction based on accomplice liability, the Commonwealth must demonstrate that an individual acted with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. *Commonwealth v. Spotz*, 716 A.2d 580, 585–86 (Pa. 1998). As with conspiracy, a shared criminal intent between the principal and his accomplice may be inferred from a defendant's words or conduct or from the attendant circumstances. *Id.*

Based upon our thorough review of the record, and even though it is unclear whether Appellant or one of his co-conspirators and/or accomplices inflicted the fatal wounds, we conclude that the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to support Appellant's convictions for first-degree murder as a conspirator and/or accomplice in the deaths of Kevin and Viet. As detailed above, Voong testified that, on August 26, 2014, he received numerous telephone calls from Kevin, asking to borrow money. Kevin instructed Voong to bring the money to Appellant's house. Voong testified that, when he arrived at Appellant's house, Appellant escorted him to the garage, where he observed Kevin and Viet stripped to their underwear, bleeding, and tied up in chairs. At this point, Voong was beaten by several masked individuals. Voong testified that he asked for additional time to collect the

remainder of the money, but Appellant responded that it was too late. Voong testified that he, along with Kevin and Viet, were placed in a van and driven to a location along the river. After he was removed from the van, Voong felt himself being stabbed in the back, chest, and neck, after which chains were strapped around his legs and he was kicked into the water. Thereafter, Voong heard Kevin and Viet scream, and then heard them being thrown into the water. Finally, Voong testified that he heard Appellant state, "It's done."

The cell phone records introduced at trial confirm the exchange of numerous phone calls between Viet and Appellant, Kevin and Viet, and Kevin and Voong on the afternoon and evening of August 26, 2014. The cell phone records further placed Kevin, Voong, and Appellant in the area of Appellant's house into the early morning of August 27, 2014, and placed Appellant's phone in the area of the crime scene that same morning. Following Voong's identification of Appellant from a photo array, police discovered at Appellant's residence roofing cement buckets with chains wrapped around them; notably, the bodies of both Kevin and Viet had roofing cement buckets chained to their legs, or floating nearby. Police also recovered from Appellant's garage duct tape that contained Kevin and Viet's hair and blood.

The above evidence presented by the Commonwealth, and the reasonable inferences deduced therefrom, was sufficient to establish that Appellant, angry when Kevin was unable to obtain the money he owed to Appellant, acted in concert with other unidentified individuals to kidnap Kevin, Viet, and Voong; bind, gag, and transport them to the river; weigh them down; stab them repeatedly; and throw them in the river, resulting in the deaths of Kevin and Viet.

### B. Admission of Cell Phone Records

In his first briefed issue, Appellant argues that the trial court erred in admitting at trial the cell phone records of Appellant, the victims, and Appellant's alleged co-conspirators, contending they were inadmissible hearsay. The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *Commonwealth v. Reid*, 99 A.3d 470, 493 (Pa. 2014).

Hearsay, defined as an out-of-court statement offered to prove the truth of the matter asserted therein, generally is inadmissible at trial, unless it falls within an exception to the hearsay prohibition. Herein, the trial court permitted the introduction of the cell phone records, admittedly hearsay, pursuant to the "business records" exception in Rule 803(6) of the Pennsylvania Rules of Evidence, which provides that a record of an act, event, or condition may be admitted under the following circumstances:

> (A) the record was made at or near the time by−or from information transmitted by−someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6).

According to Appellant, the trial court erred in admitting the cell phone records because the Commonwealth failed to establish a sufficient foundation for their admission

under this exception. Appellant acknowledges that the Commonwealth established that the cell phone records "were made in the ordinary course of business," but he contends that the Commonwealth "failed to introduce testimony as to who prepared the records and whether the records were generated at or near the time the information in question was transmitted." Appellant's Brief at 17. Appellant contends that the trial court's admission of the records "ignores" this Court's holding in *Commonwealth v. Carson*, 913 A.2d 220, 264 (Pa. 2006), wherein we determined, in the context of an ineffectiveness claim, that the defendant was not entitled to relief based on the trial court's exclusion of the defendant's records from a school for delinquent youth, which the defendant sought to introduce as mitigation evidence, because, *inter alia*, the defendant never challenged the trial court's ruling that the school records were inadmissible because they had not been authenticated.

The Commonwealth responds that Appellant has waived this claim by failing to raise at trial a contemporaneous objection to the custodians' testimony. Commonwealth's Brief at 22 (citing *Commonwealth v. Ali*, 10 A.3d 282, 293 (Pa. 2010) (failure to raise a contemporaneous objection waives claim on appeal)). It further notes that, while Appellant later offered an objection regarding the authentication of the identification of the individuals to whom the cell phone numbers belonged, *see* N.T. Trial, 11/15/16, at 69, and a general objection that the custodians of the records had not "authenticated these records to a point wherein this testimony would be admissible," *id.* at 82, Appellant at no time raised a claim, as he does now, regarding who prepared the records or whether they were generated contemporaneously. Finally, the Commonwealth points out that, even if Appellant had not waived his claim, the claim is without merit because (1) Appellant's own expert relied on the same cell phone records; and (2) all of the facts introduced via these records were established by independent sources − specifically, Voong's testimony that

he heard Appellant's voice after he and the other victims were thrown in the river, Vo's testimony that she called Appellant multiple times on the night of the murders, and Voong's testimony that he saw Kevin and Viet in Appellant's garage in the hour prior to the murders.

Not only does Appellant fail to offer a cogent argument as to how the trial court's admission of the cell phone records was contrary to our decision in *Carson*, we conclude that Appellant waived his objection to the admission of the cell phone records by failing to lodge a specific objection at trial regarding his present challenge concerning the identity of the individuals who prepared the records, and the time they were prepared. *See Commonwealth v. Cash*, 137 A.3d 1262, 1275 (Pa. 2016) (where a defendant raises an objection before the trial court on specific grounds, only those grounds are preserved for appeal); Pa.R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

## C. Voir Dire

Appellant next contends that the trial court erred in prohibiting defense counsel from informing and questioning potential jurors about Appellant's prior conviction for voluntary manslaughter in New York, which is equivalent to the crime of third-degree murder in Pennsylvania, in violation of his right to due process under the Sixth and Fourteenth Amendments to the United States Constitution,[11] and Article I, Sections 6 and 9 of the Pennsylvania Constitution.[12]

---

[11] The Sixth Amendment, which is applicable to the states through the Fourteenth Amendment, provides, in relevant part:
> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.

U.S. Const. amend. VI.
[12] We note that, while in the headings of his brief Appellant suggests he is raising challenges under both the United States Constitution and the Pennsylvania Constitution,

The Sixth and Fourteenth Amendments guarantee a defendant the right to, *inter alia*, an impartial jury, and this right extends to both the guilt and sentencing phases of trial. *Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992). In a capital proceeding, "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 728 (citations omitted). The high Court explained:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

*Id.* at 729.

To enable a capital defendant to enforce his [constitutional] right to an impartial jury, he must be afforded an adequate *voir dire* to identify unqualified jurors: "*Voir dire* plays a critical function in assuring the criminal defendant that his right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and

---

Appellant limits his discussion primarily to federal case law, and fails to offer any specific argument under our organic charter. Thus, we will analyze Appellant's claims under the federal Constitution. However, for reference purposes, Article I, Section 6 of the Pennsylvania Constitution guarantees a defendant a trial by jury, and Article I, Section 9 of the Pennsylvania Constitution guarantees a defendant an impartial jury. Pa. Const. Art. I, §§ 6 and 9.

evaluate the evidence cannot be fulfilled." *Id.* at 729-30 (internal quotation marks omitted).

While this Court has explained that the scope of *voir dire* is within the sound discretion of the trial court, *see* C*ommonwealth v. Bridges,* 757 A.2d 859, 872 (Pa. 2000), the United States Supreme Court has stated that the exercise of the trial court's discretion, and the restriction upon inquiries at the request of counsel, are "subject to the essential demands of fairness." *Morgan*, 504 U.S. at 730 (citation omitted). The high Court further held that, particularly in capital cases, "certain inquires must be made to effectuate constitutional protections," including questions regarding racial prejudice, and questions as to whether a juror's views on the death penalty would disqualify him from sitting, either because the juror's opposition to the death penalty is so strong that it would prevent the juror from ever imposing the same,[13] or because the juror would always impose the death penalty following a conviction. *Id.* at 730-33.

In denying Appellant's request to specifically inform and question potential jurors about his prior conviction for manslaughter in New York,[14] the trial court relied on this

---

[13] As the high Court explained in *Lockhart v. McCree*, 476 U.S. 162 (1986):

> [T]he State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence. *Ipso facto*, the State must be given the opportunity to identify such prospective jurors by questioning them at *voir dire* about their views of the death penalty.

*Id.* at 170 n.7

[14] Prior to *voir dire*, the trial court did advise the prospective jurors that the Commonwealth intended to seek the death penalty if Appellant was convicted of first-degree murder, and posed two questions to the prospective jurors, the first being: "Do you have any religious, moral, ethical, personal or conscientious beliefs or scruples which would prevent you from considering and imposing the death penalty, assuming that the death penalty is warranted and that a proper case with the death penalty has been made out? If so, please raise your number." N.T. Trial, 10/31/16, at 20. Approximately 40 prospective jurors responded. The trial court then asked the prospective jurors: "Do you have any religious,

Court's decision in *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003). In *Bomar*, the appellant was sentenced to death following his conviction of first-degree murder, rape, aggravated assault, kidnapping, and abuse of a corpse. On appeal, the appellant claimed, *inter alia*, that the trial court denied him the opportunity to "life qualify"[15] the jury during *voir dire* by restricting him from "questioning potential jurors about specific aggravating circumstances which might cause them to impose a death sentence and specific mitigating circumstances which might cause them to return a sentence of life imprisonment." *Id.* at 847. Observing that the appellant failed to identify any instance in which he sought to question potential jurors regarding a specific *aggravating* circumstance, this Court addressed the three occasions on which the appellant claimed he was precluded from questioning potential jurors concerning specific potential *mitigating* circumstances, including the appellant's childhood, his character and record of "good deeds," and "circumstances about [the appellant]." *Id.* at 847-48.

In holding that the trial court did not err in prohibiting the appellant from posing those questions to the potential jury, we explained:

> The purpose of *voir dire* is solely to ensure the empanelling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court. Neither counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of a case. "*Voir dire* is not to be utilized as a tool for

moral, ethical, personal or conscientious beliefs or scruples that would prevent you from considering and imposing a sentence of life imprisonment without parole, assuming that sentence, the sentence of life in prison without parole, is warranted and that a proper case for that sentence has been made out? If so, please raise your number." *Id.* at 20-21. Approximately 10 jurors responded.

[15] The term "life-qualify" refers to the process of identifying prospective jurors who have a fixed opinion that a sentence of death should always be imposed for a conviction of first-degree murder. *Commonwealth v. Smith*, 131 A.3d 467, 477 (Pa. 2015).

the attorneys to ascertain the effectiveness of potential trial strategies."

*Id.* at 849 (citations omitted).

We concluded that the questions the appellant in *Bomar* sought to ask prospective jurors:

> were intended to elicit what the jurors' reactions might be when and if appellant presented certain specific types of mitigating evidence. The questions were simply not relevant in seeking to determine whether the jurors would be competent, fair, impartial and unprejudiced. Rather, the queries at issue sought to gauge the efficacy of potential mitigation strategies. Moreover, in the face of these inappropriate questions, the trial court asked appropriate general questions which revealed that the jurors in question would consider all the evidence, both aggravating and mitigating, and follow the court's instructions.

*Id.*

Initially, Appellant attempts to distinguish *Bomar* on the ground that the existence of his own prior conviction for voluntary manslaughter:

> was not a fact that might be developed from the penalty phase. Rather, it was a virtual certainty since neither party disputed its existence. Further, trial counsel's request for [*voir*] *dire* on this fact was not an effort to learn what the prospective jurors' decisions would be when confronted with it. Rather, Appellant merely sought to identify potential jurors who would fail to keep an open mind or consider any additional evidence and instead automatically vote for death upon learning of this fact.

Appellant's Brief at 20.

Appellant fails to acknowledge, however, that, subsequent to *Bomar*, this Court rejected this same argument in *Commonwealth v. Smith*, 131 A.3d 467 (Pa. 2015). In *Smith*, the appellant claimed the trial court denied him due process and the right to a fair and impartial jury when it prohibited him from posing the following question to the potential jury: "You will hear that [the defendant] was convicted, by plea of guilty, to the crime of

[v]oluntary manslaughter in 1980. Is there any one of you who feels that[,] because of the defendant's prior convictions, that you would not consider a sentence of life imprisonment[?]" *Id.* at 476. On direct appeal, the appellant argued that, pursuant to the high Court's decision in *Morgan v. Illinois*, he should have been permitted to ask this specific question in order to life qualify potential jurors. This Court held that the appellant's proposed question was impermissible under *Bomar*, as it was "a question designed to elicit what the jurors' reactions might be when presented with a specific aggravating circumstance." *Smith*, 131 A.3d at 477. We further noted that each prospective juror had already been "life-qualified" on the appellant's first-degree murder conviction. *Id.* at 478.

Then Justice, now Chief Justice, Saylor filed a dissenting opinion in *Smith*, joined by this author, wherein he observed that the federal district court in *United States v. Johnson*, 366 F. Supp.2d 822 (N.D. Iowa 2005), distinguished between "1) case-specific *voir dire* questions designed to determine whether jurors harbor some bias relative to critical facts to be demonstrated by trial evidence, and 2) interrogatories seeking to pre-commit jurors to a particular verdict." *Smith*, 131 A.3d at 479 (Saylor, J., dissenting). The *Johnson* Court suggested that case-specific questions might be necessary under the Constitution to ensure that a defendant has a fair and impartial jury. Concluding that the *Smith* majority "appears to implicitly reject *Johnson's* approach to case-specific questions" based on *Bomar*, Chief Justice Saylor opined that *Bomar's* rationale "applies only to pre-commitment-type interrogatories . . . and not to case-specific questions appropriately framed to inquire into juror biases relative to critical facts." *Id.* He further stated that he "would follow the lead" of the California Supreme Court in *People v. Cash*, 50 P.3d 332 (Cal. 2002), which held that an absolute prohibition of case-specific questions regarding a previous homicide during life qualification "created a risk that a juror who would automatically vote to impose the death penalty on a defendant who had

previously committed murder [or manslaughter] was empaneled and acted on those views, thereby violating defendant's due process right to an impartial jury." *Smith*, 131 A.3d at 479 (Saylor, J., dissenting) (quoting *Cash*, 50 P.3d at 342-43).

In his brief to this Court, Appellant does not mention, let alone discuss, the majority opinion in *Smith*, nor does he suggest that *Smith* should be overturned. He merely asserts that "[a] number of other jurisdictions" have recognized that the type of question he sought to ask "is essential to satisfying *Morgan's* requirement of an impartial factfinder," citing *Johnson, Cash,* and the dissent in *Smith*, and urges this Court to adopt their rationale, and grant him a new penalty hearing.[16] Appellant's Brief at 20. We decline his invitation to do so.

As discussed above, this Court in *Smith* held that the appellant's proposed question was impermissible under *Bomar*, as it was "a question designed to elicit what the jurors' reactions might be when presented with a specific aggravating circumstance." *Smith*, 131 A.3d at 477. While Appellant relies on the dissent in *Smith*, that position was

---

[16] Appellant also fails to acknowledge our decision in *Commonwealth v. Mattison*, 82 A.3d 386 (Pa. 2013), wherein the appellant claimed that the trial court erred during *voir dire* by precluding him from asking potential jurors whether they would be adversely influenced, or would otherwise be unable to follow the trial court's instructions, upon learning the appellant had a prior murder conviction in another state. The Commonwealth had offered pretrial notice that, during the penalty phase of trial, it would rely on Mattison's prior murder conviction as evidence of an aggravating circumstance pursuant to 42 Pa.C.S. § 9711(d)(11). Like Appellant herein, Mattison argued that, because he was denied the opportunity to life qualify the jury, he was denied his constitutional right to an impartial jury in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

This Court rejected Mattison's claim, concluding that he failed to demonstrate that the trial court abused its discretion or "unduly limited *voir dire* by precluding questioning that would have disclosed his previous murder conviction prior to the jury's determination of his guilt." *Mattison*, 82 A.3d at 397. We observed that, rather than ensuring an impartial jury, "permitting pretrial questioning of the potential jurors regarding [Mattison's] 1995 murder conviction could have biased the jury against him, and laid the foundation for an arguably meritorious claim of ineffective assistance of counsel on collateral review." *Id.*

not adopted by a majority of this Court. Accordingly, we hold that Appellant is not entitled to relief based on his claim that he should have been permitted to question the jury regarding his prior conviction for manslaughter in New York. [17]

---

[17] Our learned colleague would overturn this Court's decision in *Smith*. Specifically, in his concurring and dissenting opinion, Justice Wecht suggests that this Court reached its majority holding in *Smith* "without analysis," and he aligns himself with Chief Justice Saylor's dissent in *Smith*, which this author joined. Concurring and Dissenting Opinion (Wecht, J.) at 8-9. Recognizing that Appellant fails to discuss the majority holding in *Smith*, Justice Wecht nonetheless opines that our "evaluation" of Appellant's argument is "unduly narrow," and submits that Appellant's "analysis" of *Smith* is "implicit in his adoption of Chief Justice Saylor's dissent, which demonstrated that the *Smith* majority was incorrect." *Id.* at 9. Further, citing his own concurring opinion in *Balentine v. Chester Water Auth.,* 191 A.3d 799, 812 (Pa. 2018) (Wecht, J., concurring) ("[A]gainst the critical importance of stability we must balance our duty as a court of last resort to refine or even abandon precedent when time and experience reveal its infirmity."), Justice Wecht suggests that we can, and should, overturn *Smith*, despite the fact that Appellant does not ask us to do so. Concurring and Dissenting Opinion (Wecht, J.) at 9 & n.5. Finally, acknowledging this Court's earlier decision in *Mattison*, in which this Court also rejected the same claim raised by Appellant herein, Justice Wecht remarks that, in *Mattison*, "the Court did not examine the extra-jurisdictional precedent upon which [Appellant] now relies. Accordingly, this Court presently is confronted with more developed and persuasive advocacy on this issue than was available in *Mattison*." *Id.* at 8 n.4.

It is not this Court's function to act as an advocate for the parties. *See Commonwealth v. Capitolo*, 498 A.2d 806, 811 (Pa. 1985) ("We require strict compliance with the procedures designed for issue preservation to save judicial manpower, and to prevent our appellate courts from becoming advocates for parties instead of adjudicators of the issues they present for our review."). Moreover, even if Appellant had presented sufficient argument on the issue, we find no basis upon which to overturn *Smith*. Under the venerable doctrine of *stare decisis*, "for the sake of certainty, a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different." *Commonwealth v. Moore*, 103 A.3d 1240, 1249 (Pa. 2014) (citation omitted). *Stare decisis* serves an important role by "promot[ing] the evenhanded, predictable, and consistent development of legal principles, foster[ing] reliance on judicial decisions, and contribut[ing] to the actual and perceived integrity of the judicial process." *Id.* As discussed above, the majority in *Smith* held that the appellant's proposed question was impermissible under *Bomar*. *Smith*, 131 A.3d at 477. Although Appellant and Justice Wecht prefer the approach of the dissent in *Smith*, that position was rejected by a majority of this Court. Further, while, as a general matter, we take no issue with Justice Wecht's statement that this Court may "abandon precedent when time and experience reveal its infirmity," we observe that *Smith* was decided less than five years ago, and neither Appellant, nor Justice Wecht, suggests that our experience with *Smith* has revealed it to be unworkable, or that the decision is otherwise

**D. Prosecutor's Questions Regarding Witness's Knowledge of Appellate Process**

Appellant next argues that the trial court erred in denying his request for a mistrial during the penalty phase of his trial after the prosecutor asked an expert defense witness if she was aware of the length of the appellate process. In his effort to obtain a life sentence instead of the death penalty, Appellant presented the testimony of Dr. Annie Steinberg, an expert in child psychology and development, who testified regarding Appellant's relationship with his children. Specifically, Dr. Steinberg testified that Appellant was a central part of the children's lives, and played an active part in the family, notwithstanding his incarceration. During cross-examination, the prosecutor asked Dr. Steinberg if she was aware that the same visitation procedures applied to both capital and non-capital prisoners. N.T. Trial, 12/2/16, at 50-51. The prosecutor then asked Dr. Steinberg if she was aware that, before a death warrant gets signed by the Governor, the appellate process generally takes approximately ten years. *Id.* at 52. Defense counsel objected, and the trial court sustained the objection. *Id.* at 52, 55. Appellant presently argues that the only "possible purpose [of the prosecutor's comment on the appellate process] was to instill a sentiment among the jurors that they were less responsible for their sentencing decision," in violation of case law which prohibits the same. Appellant's Brief at 22.

In response to Appellant's argument, the Commonwealth asserts that Appellant waived this claim by failing to raise it before the trial court. The Commonwealth notes that, while Appellant requested a mistrial on December 5, 2016, the request was not based on the prosecutor's question regarding the length of the appellate process, but, rather, was based on the prosecutor's alleged misstatement of the regulations concerning

infirm. Notably, none of the decisions Justice Wecht cites in support of his position post-date *Smith*. At most, Justice Wecht's view represents a difference of opinion regarding precedent of very recent vintage.

the visitation status of prisoners on death row. Indeed, although the trial court denied Appellant's request for a mistrial at that time, it did instruct the jury as to the differences between visitation afforded to capital versus non-capital defendants. N.T. Trial, 12/5/16, at 35.

As discussed above, where an appellant raises an objection before the trial court on specific grounds, only those grounds are preserved for appeal. As Appellant did not request a mistrial based on the prosecutor's commentary regarding the length of the appeals process, this claim is waived. *See Cash*, 137 A.3d at 1275; Pa.R.A.P. 302(a).

### E. Prosecutor's Statements Regarding Mitigating Circumstances

Appellant next claims that he was deprived of a fair penalty phase trial, and is entitled to a new penalty trial, because the prosecutor, on two separate occasions, misstated the law regarding the weighing of aggravating and mitigating circumstances. The first alleged instance occurred at the beginning of the prosecutor's closing argument to the jury, wherein she stated, "If you find that we've proven a single aggravating factor, one single aggravating factor, your sentence must be death. Unless and until the defense proves a mitigating factor, at which point you must weigh the two and decide which outweighs the other one." N.T. Trial, 12/6/16, at 139. Appellant maintains that "[t]hese remarks mislead the jury as to their starting point in deliberations, thereby irreparably tainting any subsequent verdict." Appellant's Brief at 22.

The Commonwealth concedes that the above statement was incorrect because the prosecutor did not convey that a jury's finding of a single aggravating circumstance requires a sentence of death only when the jury finds no mitigating circumstances. Commonwealth Brief at 38. However, the Commonwealth maintains that the Appellant's claim that he was deprived of a fair penalty trial is both waived and meritless. We agree.

Immediately after the prosecutor made the above statement, defense counsel lodged an objection, which was sustained by the trial court. The prosecutor then correctly stated to the jury: "You must decide whether or not the aggravating factors outweigh the mitigating circumstances. And if you do, then your sentence is death." N.T. Trial, 12/6/16, at 139. Defense counsel did not request a mistrial at this time. Accordingly, Appellant cannot claim for the first time on appeal that a mistrial was required. *Commonwealth v. Jones*, 460 A.2d 739, 741 (Pa. 1983) (where defense counsel immediately lodges an objection to a statement by the prosecutor, and the objection is sustained, and defense counsel makes no further request for a mistrial or curative instructions, the issue has been waived).

Appellant argues that the prosecutor subsequently "compounded" her prior error by "informing the jury that it was defendant's burden to prove that mitigating circumstances outweighed any aggravating circumstances." Appellant's Brief at 23. In commenting on the lack of "real" mitigation evidence presented by Appellant, the prosecutor stated, "It's what we call the catchall. The catchall. Which has to do with the defendant; which has to do with the circumstances of the offense, the defendant's record, and his character. That's what they are proposing is enough to outweigh, to outweigh all of the aggravators." N.T. Trial, 12/6/16, at 147. Defense counsel again immediately lodged an objection, which was sustained by the trial court. The trial court further instructed the jury that "[t]he mitigators do not have to outweigh the aggravators. Sustained." *Id.*

Once again, because defense counsel lodged an immediate objection to the prosecutor's misstatement, which was sustained by the trial court, and defense counsel did not request a mistrial or further curative instructions, the issue has been waived. *Jones*, 460 A.2d at 741.

## F. Exclusion of Portion of Decedent's Family's Victim Impact Statement

Prior to the Commonwealth's presentation of its penalty-phase case, and while otherwise seeking to introduce victim impact statements by members of Kevin's and Viet's family, the Commonwealth moved to exclude a portion of two identical statements wherein the family did not express a preference as to whether Appellant would receive a life sentence or a death sentence, so long as he was never released from prison. In this regard, each statement provided:

> In the interests of justice and the safety of our community, I'm asking that you please see it that the defendant never again be able to take the life of any other persons; that he be given the death penalty, or at least jailed for two life sentences, to be served one after the other. He should never again walk among us as an equal, free man.

N.T. Trial, 12/5/16, at 11-12. Appellant objected to the exclusion of these portions of the statements, which, according to Appellant, "would have constituted a powerful reminder to the jurors to keep an open mind and consider both life and death." Appellant's Brief at 24.

In granting the Commonwealth's request to exclude the above-quoted portions of the victim impact statements, the trial court determined that the proffered statements were outside the scope of permissible victim evidence. We find no error by the trial court in this regard. Victim impact evidence consists of "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim." *Bomar*, 826 A.2d at 850 (citations omitted). In the case *sub judice*, the proffered testimony did not pertain to any characteristic of the victims, or the impact of their death on their families. Moreover, we specifically held in *Bomar* that "evidence that a member of the victim's family is opposed to the death penalty is irrelevant under Pennsylvania's capital sentencing scheme," as it is unrelated to the defendant's "character or record or the circumstances of the crime." *Id.* at 852. Accordingly, Appellant is not entitled to relief on this claim.

## G. Challenges to Pennsylvania's Death Penalty Statute

Next, Appellant raises two challenges to Pennsylvania's capital sentencing statute, 42 Pa.C.S. § 9711. He first contends that the statute violates the Fifth[18] and Sixth Amendments to the United States Constitution, and Article I, Sections 6 and 9 of the Pennsylvania Constitution, because it "permits a jury to make a factual finding in the absence of proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances." Appellant's Brief at 24. The Commonwealth asserts that Appellant's argument is without merit,[19] a position with which we agree.

In *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000), the United States Supreme Court held that any fact that increases a defendant's sentence beyond the statutory maximum authorized for a defendant's crime is an element that must be submitted to the jury. This requirement extends to capital punishment. *See Ring v. Arizona*, 536 U.S. 584, 608 (2002) (concluding that Arizona's capital sentencing scheme violated *Apprendi* because it allowed a judge, as opposed to a jury, to find the facts necessary to sentence a defendant to death). Subsequently, in *Alleyne v. United States*, 570 U.S. 99, 112 (2013), the high Court held that *Apprendi* "applies with equal force to facts increasing [a] mandatory minimum."

Section 9711(a)(1) of Pennsylvania's capital sentencing statute requires that, following a conviction for first-degree murder, a separate hearing be conducted "in which the jury shall determine whether the defendant shall be sentenced to death or life

---

[18] The Fifth Amendment provides, in relevant part, that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V.

[19] Notwithstanding its multi-page argument that Appellant's claim is without merit, *see* Commonwealth Brief at 47-51, the Commonwealth summarily suggests at the end of its argument that it is "troubling" that a capital jury in Pennsylvania is not instructed as to the burden of proof in determining whether an aggravator outweighs a mitigator, and it further requests that we reconsider whether, under *Alleyne*, it must be proven beyond a reasonable doubt that aggravators outweigh mitigators. *Id.* at 51. For the reasons we discuss *infra*, we reject this invitation.

imprisonment." 42 Pa.C.S. § 9711(a)(1). Moreover, Section 9711(c)(1)(iii) provides that aggravating circumstances must be proven by the Commonwealth beyond a reasonable doubt, while mitigating circumstances can be proven by the defendant by a mere preponderance of the evidence. *Id.* § 9711(c)(1)(iii).

Finally, Section 9711(c)(1)(iv) allows for a sentence of death only where the jury finds at least one aggravator and no mitigators, or finds that the aggravators outweigh the mitigators. It is this subsection on which Appellant bases his argument that the capital sentencing scheme is unconstitutional because it does not require that "all factual determinations implicit in capital sentencing, *including those regarding the relative weight of aggravating and mitigating circumstances*," be established beyond a reasonable doubt. Appellant's Brief at 28 (emphasis added). This Court, however, has repeatedly rejected this argument.

In *Commonwealth v. Roney*, 866 A.2d 351 (Pa. 2005), the appellant similarly argued that Pennsylvania's death penalty statute violates the Sixth and Fourteenth Amendments because it does not require the jury to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. We denied relief, noting that "this Court has consistently rejected the argument that the Pennsylvania death penalty statute is invalid because it imposes no standards by which a jury can weigh aggravating and mitigating circumstances." *Id.* at 361 (citing *Commonwealth v. Bronshtein*, 691 A.2d 907 (Pa. 1997), and *Commonwealth v. Zettlemoyer*, 454 A.2d 927 (Pa. 1982)).

Subsequently, in *Commonwealth v. Sanchez*, 82 A.3d 943 (Pa. 2013), the appellant raised the identical argument raised in *Roney*, but asked this Court to reconsider our holding in *Roney* in light of the decision of the Sixth Circuit Court of Appeals in *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2001), where an analogous

provision of the Federal Death Penalty Act of 1994, 18 U.S.C.S. § 3591, *et seq.*, was initially held by a federal circuit panel to be unconstitutional under *Apprendi* and *Ring*. We declined to reconsider our determination in *Roney*, however, noting that the Sixth Circuit had granted reargument *en banc*, after which it concluded that the reasonable doubt standard does not apply to the weighing of aggravating and mitigating factors because the weighing process is not a factual determination, but, rather, a "complex moral judgment." *Sanchez*, 82 A.3d at 985 (citing *United States v. Gabrion*, 719 F.3d 511(6th Cir. 2013) (*en banc*)). Thus, we held in *Sanchez* that our decision in *Roney* was controlling.

Most recently, in *Commonwealth v. Wholaver*, 177 A.3d 136, 172 (Pa. 2018), we rejected the appellant's claim that a trial court is required to instruct a jury that, in order to sentence a defendant to death, it must determine that the aggravating factors outweigh mitigating factors beyond a reasonable doubt, citing our decisions in *Roney* and *Sanchez*.

Appellant, however, suggests that our holding in *Wholaver* was incorrect because it relied on *Roney* and *Sanchez*, both of which pre-date the United States Supreme Court's decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016). According to Appellant, the high Court in *Hurst* "clarified for the first time that, where the weighing of facts in aggravation and mitigation is a precursor to a death sentence, the Sixth Amendment requires the State to prove, to a jury, beyond a reasonable doubt, that aggravating circumstances outweigh mitigating circumstances." Appellant's Brief at 25 (citing *Hurst*, 136 S.Ct. at 621-22). Appellant misreads *Hurst*.

In *Hurst*, the appellant challenged the constitutionality of Florida's capital sentencing scheme, which provided for a recommendation regarding death by a penalty-phase jury, but required a separate hearing by a judge to determine whether sufficient aggravating circumstances existed to justify imposition of the death penalty. In holding

that the sentencing scheme was unconstitutional, the high Court recounted its prior holding in *Ring*, and stated:

> The analysis the *Ring* Court applied to Arizona's sentencing scheme applies equally to Florida's. Like Arizona at the time of *Ring*, Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts. . . . Although Florida incorporates an advisory jury verdict that Arizona lacked, we have previously made clear that this distinction is immaterial: "It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona."

*Hurst*, 136 S.Ct. at 622 (citations omitted).

In response to an argument by the State that the mere recommendation by a jury of a death sentence "necessarily included a finding of an aggravating circumstance," thus satisfying *Ring*, the Court stated:

> The State fails to appreciate the central and singular role the judge plays under Florida law. As described above and by the Florida Supreme Court, the Florida sentencing statute does not make a defendant eligible for death until "findings *by the court* that such person shall be punished by death." Fla. Stat. § 775.082(1) (emphasis added). The trial court *alone* must find "the facts … [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." § 921.141(3). . . . The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that *Ring* requires.

*Hurst*, 136 S.Ct. at 622 (emphasis original).

The *Hurst* Court determined that Florida's capital sentencing scheme violated the Sixth Amendment because it required a judge, as opposed to a jury, to make the critical findings needed for the imposition of a death sentence. *Hurst* did not, contrary to

Appellant's argument, require that, in order to conclude that a sentence of death is appropriate, a jury determine that the aggravating circumstances *outweigh* the mitigating circumstances beyond a reasonable doubt.

In light of our rejection of Appellant's argument that a jury is required to determine that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, his derivative argument that the trial court's failure to instruct the jury in accordance with this principle violated his rights under the federal and Pennsylvania Constitutions also is without merit.

In his second challenge to Pennsylvania's death penalty scheme, Appellant contends that the death penalty is administered in an "arbitrary and capricious" manner, in that it is "no longer reserved for the worst offenders culpable of the most serious offenses but, rather, in large part, is imposed on defendants who refuse to offer, or accept, a life plea." Appellant's Brief at 29. According to Appellant, use of the death penalty as a "bargaining chip" to secure a defendant's plea of guilty does not further the traditional "retributivist view" of punishment, but instead has a "perverse impact on the criminal justice system," in that it increases the possibility that an innocent defendant will plead guilty to avoid a potential capital sentence, and increases the possibility that individuals sentenced to death are actually innocent. *Id.* at 35-36. Appellant also suggests that many of the individuals who choose to go to trial instead of pleading guilty, and who may ultimately be sentenced to death, are "too encumbered by mental illness, intellectual limitations, or too immature to offer or accept a plea to life without parole." *Id.* at 39. In support of his arguments, Appellant relies on numerous surveys from other states, and various newspaper, magazine, and law review articles.

The Commonwealth responds that Appellant waived his claim by failing to present any of the authority on which his claim is based to the trial court. The Commonwealth

further contends that Appellant fails to demonstrate how any of the argument or information he offers is relevant to either his conviction or sentence. We agree with the Commonwealth that Appellant's claim is waived. Appellant, in his pre-penalty-phase "Motion to Hold the Pennsylvania Death Penalty Statute Unconstitutional and Strike the Commonwealth's Notice of Death," did not claim that the death penalty is administered in an arbitrary and capricious manner.[20] *See* Motion, 12/1/16 (R.R. at 2-19). Indeed, he first raised this particular claim in his Concise Statement of Errors Complained of on Appeal, after filing his notice of appeal. As noted above, issues not raised in the lower court are waived, and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a).[21]

## H. Statutory Review of Death Sentence

Finally, although Appellant does not raise the issue in his brief, this Court is statutorily required to conduct an independent review to determine (1) whether the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (2) if the evidence fails to support the finding of at least one aggravating circumstance listed in 42 Pa.C.S. § 9711(d). *See* 42 Pa.C.S. § 9711(h)(3) (requiring affirmance of the sentence of death unless this Court concludes either of these two factors are present); *Commonwealth v. Ballard*, 80 A.3d 380, 409-10 (Pa. 2013) (same).

---

[20] Rather, as addressed above in Part II(G), Appellant argued that Pennsylvania's death penalty statute violates the Fifth and Sixth Amendments to the United States Constitution because it allows a jury to make a factual finding in support of a death sentence in the absence of proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.

[21] Nevertheless, we agree with the Commonwealth that Appellant does not suggest his decision to go to trial was the result of his mental illness, intellectual limitations, or immaturity, nor does he suggest that he was offered a plea of a life sentence that he refused to accept. Indeed, as noted by the Commonwealth, Appellant fails to show that the Commonwealth's decision to seek a capital sentence "had any other basis than the facts that gave rise to the jury's finding of five aggravating circumstances." Commonwealth's Brief at 54.

Following a thorough review of the entire record in this case, we hold that Appellant's sentences of death were not the product of passion, prejudice, or any other arbitrary factor, but, rather, were supported by the evidence that Appellant and/or his unidentified co-conspirators/accomplices stabbed Kevin and Viet multiple times, bound and gagged them, weighted them down, and threw them into the river with malice and the specific intent to kill them.   Moreover, the Commonwealth proved the following aggravating factors beyond a reasonable doubt with respect to each victim:  (1) the victim was being held for ransom or reward, 42 Pa.C.S. § 9711(d)(3); (2) the offense was committed during the perpetration of a felony, *id.* § 9711(d)(6); (3) the offense was committed by means of torture, *id.* § 9711(d)(8); (4) Appellant had "been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable," *id.* § 9711(d)(10); and (5) Appellant had been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503, committed in another jurisdiction either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(12).   The jury found a single mitigating circumstance, the "catch-all mitigator," *id.* § 9711(e)(8), and found that the aggravating circumstances outweighed the mitigating circumstance.

As the jury found that the aggravating circumstances outweighed the mitigating circumstance, Appellant's sentences comply with the statutory mandate for the imposition of a sentence of death.  *See id.* § 9711(c)(1)(iv).  Accordingly, there are no grounds upon which to vacate Appellant's death sentences pursuant to 42 Pa.C.S. § 9711(h)(3).

For all of the above reasons, we affirm Appellant's convictions and sentences of death.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht files a concurring and dissenting opinion.