**[J-19-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 92 MAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court dated June 14, 2021 |
| | : | at No. 3302 EDA 2019 Affirming the |
| v. | : | Judgment of Sentence of the |
| | : | Montgomery County Court of |
| | : | Common Pleas, Criminal Division, |
| LISA SMITH, | : | dated July 31, 2019 at No. CP-46- |
| | : | CR-0001628-2018. |
| Appellant | : | |
| | : | ARGUED: September 13, 2022 |
| | : | |
| | : | RESUBMITTED: January 31, 2024 |

**OPINION**

**CHIEF JUSTICE TODD**                                  **DECIDED: October 24, 2024**

In this appeal by allowance, we consider whether Appellant Lisa Smith's Sixth Amendment right to confrontation was violated when the redacted statement of her non-testifying co-defendant was admitted at trial. For the reasons below, we hold that there was no violation of Appellant's Sixth Amendment right, and, therefore, we affirm the Superior Court's decision.

On January 22, 2018, Appellant, who was six months pregnant, and her four-year-old son, Tahjir, were living with Keiff King, Appellant's boyfriend and the father of her unborn child, in a home owned by King's great-grandmother in Abington Township, outside of Philadelphia. At the time, in addition to Appellant, Tahjir, and King, residents of the home included King's great-grandmother; King's 18-year-old cousin; and King's

other two children, ages three and four. At approximately 9:30 a.m. that morning, Tahjir spilled his cereal. When confronted by Appellant, Tahjir wet his pants and began stuttering, which he did when he was frightened. Throughout the day, Appellant and King subjected Tahjir to severe punishment, which included requiring him to hold a plank position for periods of time, and yelling at Tahjir when he was unable to do so. When Tahjir began "cheating" by propping his legs on the bed and complaining that he was tired, Appellant put him in a different position, forcing him to remain in a push-up position with his feet propped on a chair. Additionally, Appellant and King repeatedly hit Tahjir on his buttocks with their bare hands and a pair of flip-flop sandals. At some point when he was being beaten, Tahjir urinated on himself, and he was placed in a hot shower, which resulted in first, second, and third-degree burns to Tahjir's body. After approximately three minutes, Appellant removed Tahjir from the shower. By this time, Tahjir was unable to stand or hold his head up straight. Appellant dressed Tahjir and placed him on a sofa, and left to watch television with King, who thought Tahjir was being dramatic. Eventually, Appellant went to check on Tahjir and saw that he had fallen onto the floor, that his eyes were rolled back, and that his lips were moving in a strange manner. Because King did not want paramedics to come to the house, instead of calling an ambulance, King and Appellant attempted to obtain a ride to the hospital from two different sources. When their attempts failed, Appellant picked up Tahjir and left to get help. After walking several blocks, she could no longer carry Tahjir and she called 911. When emergency responders arrived, they observed Appellant holding Tahjir. As one of the paramedics, Lars Holm, approached Appellant, she handed him Tahjir. Although Holm indicated that he knew immediately that Tahjir was dead, he placed him in the ambulance and attempted to revive him. Tahjir was transported to the hospital, where he was pronounced dead.

Officers from the Abington Township Police Department arrived at the scene to speak with Appellant. She initially told them that she had taken a bus from Philadelphia to the Willow Grove Mall Park bus stop, and had walked with Tahjir through a parking lot to arrive at the location where she called 911. She claimed that Tahjir was having difficulty breathing and his legs were wobbly, so she picked him up to carry him, but was unable to do so because of her pregnancy. Officer Dustin Wittmer asked Appellant what brought her to the area, and she replied that she was there to see someone, but could not provide a name or phone number. When Officer Wittmer asked for the name of Tahjir's father, Appellant stated she did not know it and did not have his phone number. Officer Alex Levy also asked Appellant what brought her to the area, and she replied that she was going to visit her boyfriend, Mark Johnson, but could not provide an address or phone number for him. A few minutes later, Appellant told Officer Levy that Johnson was not her boyfriend, but, rather, the father of Tahjir and her unborn child. At this point, Officer Levy learned that Tahjir was deceased, and Appellant was transported to the police station.

At the police station, prior to receiving *Miranda* warnings, Appellant provided an oral statement indicating that, before arriving at the Willow Grove Park Mall bus stop, she had picked Tahjir up from Mark Johnson in Philadelphia and noticed he was not acting right. The detectives immediately paused the interview and read Appellant her *Miranda* warnings. She waived her right to remain silent, and agreed to provide a written statement. A detective read Appellant her *Miranda* rights a second time, which was memorialized in writing. At first, the statement was in the form of questions and answers; however, Appellant began to provide a narrative of the actual events that took place that day, including the abuse she and King inflicted on Tahjir, and the detectives typed her

statement without interruption. Appellant reviewed a written copy of her statement, made a single correction, and signed and dated each page.

In the meantime, police officers interviewed King at his great-grandmother's home and, when told Tahjir had died, King agreed to go to the police station. At the police station, King was arrested and read his *Miranda* rights. King waived his *Miranda* rights and gave a statement describing the abuse he inflicted on Tahjir on the day of his death, as well as abuse he inflicted on Tahjir in the past, including striking Tahjir in the back with a belt approximately five months before his death.

An autopsy of Tahjir revealed that he died from "crush syndrome," which was the result of his buttocks having been beaten so badly that the tissue underneath pulpified, releasing the toxic components of his cells into his blood. This, combined with the burns from the shower, caused shock and organ failure. The autopsy also revealed bruising around Tahjir's ears; scars on his back, consistent with being hit with a belt; and 11 rib fractures.

Appellant and King were charged with first-degree murder,[1] endangering the welfare of a child,[2] and criminal conspiracy,[3] and their cases were consolidated for trial. Prior to trial, Appellant filed a motion to suppress the statements she made to the police. The trial court suppressed the statements Appellant made prior to receiving her *Miranda* warnings, but admitted those made after. Appellant also sought to preclude the admission of King's statement to the police.

At trial, at which neither Appellant, nor King, testified, the trial court admitted King's statement, which had been redacted so that (1) references to the acts of abuse Appellant

---

[1] 18 Pa.C.S. § 2502(a).

[2] *Id.* § 4304(a)(1).

[3] *Id.* § 901.

inflicted upon Tahjir were omitted, and (2) when describing the circumstances surrounding the acts of abuse King inflicted upon Tahjir, Appellant's name was replaced with feminine pronouns. Also, both prior to the admission of the statement and in its closing charge to the jury, the trial court issued a cautionary instruction that the jury could only use the statement against King, not Appellant.[4] King's statement read, in relevant part:

> Q.  Who is Lisa Smith to you?
>
> A.  She is my girlfriend and pregnant with my child.
>
> Q.  How [far] along is she?
>
> A.  Six months pregnant.
>
> Q.  Does Lisa live with you?
>
> A.  Technically, yeah. She kind of commutes back and forth from Philadelphia to my house. But she stays at my house a lot.
>
> Q.  How many kids does Lisa have?
>
> A.  She had Tahjir, who was 4, and she is pregnant with my child.
>
> Q.  How long have you and Lisa been together?

---

[4] The trial court's cautionary instruction to the jury prior to admission of King's redacted statement was as follows:

> Ladies and gentlemen, you're about to hear a statement that was made by Keiff King the defendant. There is a rule that restricts the use by you of the evidence offered to show that the defendant Keiff King made a statement concerning the crimes charged. A statement made before trial may be considered as evidence only against the defendant who made that statement. So you can consider the statement that you are about to hear as evidence against Defendant Keiff King if you believe he made the statement voluntarily. You may not and you must not consider the statement as evidence against Defendant Lisa Smith. So I am telling you as a matter of law, you must not use the statement in any way against Lisa Smith.

N.T., 6/18/19, at 212-13.

A. Technically, about a year.

Q. How often does Tahjir stay at your house?

A. Pretty much every time I have my kids, he is there, too. We try to time it like that.

Q. Prior to yesterday, how long had Tahjir been there?

A. Him and Lisa came there on Thursday.

\* \* \*

Q. What happened yesterday, Monday, January 22nd, 2018, that led to the ambulance being called for Tahjir?

A. I woke up about 11:00 a.m. or 11:30 a.m. Lisa and the kids were already up. She had already fed the kids and fed my grandmom and gave my grandmom her meds. She took care of everything while I was asleep. So I wasn't aware of what happened before I got up. I just know what Lisa told me happened.

Q. How was Tahjir punished?

A. He was put in "the position." That's what it is called. He was put in like the push-up position for like ten minutes to like tire him out. I'm not sure how long he was in "the position," because I was helping my grandmom and stuff and not really paying attention.

Q. What happened after Tahjir was put in "the position"?

A. My son did something, because I had him stand in the corner, too. He stood in the corner for about 15 minutes. They were supposed to be done about the same time. Tahjir did something while he was in "the position" that got him a butt whooping.

Q. What happened next?

A. About an hour went by. I was cleaning the house and stuff. The nurses came for my grandmom. And I ran to the store.

I got a few things from the market and came back, and they finished the physical therapy with my grandmom.

Lisa fed the kids lunch and stuff. I watched a little TV and then went back to the store. The first time I went to Giant, and the second time I went to the store I went to Aldi's to get snacks and stuff for the kids.

On my way to Aldi's she called me. She put me on speakerphone, and I was telling Tahjir that he would

have been off punishment if he had listened to his mom.

Q. Had Tahjir been put back into "the position" before you left for Aldi's?

A Yes.

Q. How long did he remain in that position this time?

A. It was roughly like 15 minutes or so. It was right after he finished eating his lunch, and then I left for Aldi's and she called me on my way to Aldi's.

\* \* \*

Q. What happened when you got home?

A. I took Tahjir into the bathroom and spanked his butt. And then he got into the shower.

Q. How did you spank his butt in the bathroom?

A. He had underwear on, so I used my open hand like two or three times. Then I used a slipper that she had been using, and I used that to hit his butt three or four times; so like five or six times altogether.

Q. Did you remove Tahjir's pants in the bathroom?

A. He took them off himself because he knew it was butt-whooping time.

Q. Did you spank Tahjir at all in the bedroom?

A. No.

Q. Were you in the bathroom when Tahjir got into the shower?

A. As he was getting into the shower, I was exiting.

Q. Who turned the shower on?

A. I turned it on as he was getting undressed to get into the shower.

Q. Were you in the bathroom when Tahjir stepped into the shower?

A. Technically yes and no. As he was stepping in the shower, I was leaving out the bathroom.

Q. Did you hear Tahjir yell or complain about the water being too hot?

A. I think he said something about the shower being too hot. I didn't hear him say – I did hear him say something like, "It's hot."

Q. When he said it was hot, what did you do?

A. I was already walking out.

Q. Did you strike Tahjir at all anywhere other than in the bathroom?

A. No.

Q. Did you strike Tahjir anywhere other than on his butt?

A. I may have whacked his back while he was turning. But outside of that, no.

Q. What did you hit him in the back with?

A. It was still the slipper.

\* \* \*

Q. About what time was it when you spanked Tahjir in the bathroom?

A. Roughly like ten minutes after I got back from Aldi's, so around like 4:00 p.m.

Q. Were you in the bathroom at all while Tahjir was in the shower?

A. I was walking out as he was getting in.

Q. When did you know there was a problem with Tahjir?

A. I was in my bedroom eating when I was told Tahjir was acting weird. I went out, and he was like lying on the couch at first.

Q. What did Tahjir look like when he was lying on the couch?

A. He was dressed and lying down on the couch. He gets dramatic sometimes, and that's what he was doing. He was like laying there like he was going to sleep.

I went back into my bedroom and I told her that he was just being dramatic. I finished eating, I found something to watch on TV and was told again to come look.

This time Tahjir was on the floor in the living room, looking like he was going to pass out and stuff.

N.T., 6/18/19, 215-22.

Appellant and King were convicted of the aforementioned charges, and Appellant was sentenced to life in prison without parole, followed by an additional 15 to 30 years incarceration. Appellant appealed her judgment of sentence to the Superior Court, asserting, *inter alia*, that the admission of King's redacted statement at their joint trial violated her Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968) (admission at a joint trial of a non-testifying co-defendant's statement that incriminates the defendant violates the Confrontation Clause, even if the trial court issues a cautionary instruction). The Superior Court affirmed Appellant's judgment of sentence in a unanimous memorandum opinion, adopting in full the trial court's opinion and stating, "[t]he trial court did not abuse its discretion in admitting King's redacted confession in the joint jury trial, solely for the purpose of inculpating King. The trial court's explanation for this evidentiary ruling is rational and does not override the law." *Commonwealth v. Smith,* 2021 WL 2418696, at *2 (Pa. Super. filed June 14, 2021).

Appellant filed a petition for allowance of appeal with this Court, and we granted review to consider whether the trial court's admission of King's redacted statement violated this Court's decisions interpreting *Bruton*, specifically *Commonwealth v. Rainey*, 928 A.2d 216 (Pa. 2007), and *Commonwealth v. Johnson*, 378 A.2d 859 (Pa. 1977).[5]

Preliminarily, we note that the admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *Commonwealth v. Le*, 208 A.3d 960, 970 (Pa. 2019). An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or

---

[5] Appellant's brief does not contain any reference to, or discussion of, Article I, § 9 of the Pennsylvania Constitution. Thus, we will consider Appellant's claims under only the federal constitution.

the result of bias, prejudice, ill-will, or partiality. *Commonwealth v. Talley*, 265 A.3d 485, 530 (Pa. 2021).

The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of confrontation includes the right to cross-examine witnesses. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

In *Bruton*, the United States Supreme Court held that a defendant's Confrontation Clause rights are violated when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at a joint trial, even when accompanied by a jury instruction that the confession may be considered only against the co-defendant. The high Court explained:

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

391 U.S. at 135-36 (citations and footnotes omitted).

Nearly 20 years after *Bruton*, the high Court considered whether that decision applies when a confession of a non-testifying co-defendant which has been altered to remove the defendant's name, as well as any reference to his existence, is admitted at

trial and a proper limiting instruction is given by the trial court. In *Richardson v. Marsh*, three individuals − Gloria Richardson, Benjamin Williams, and Kareem Martin − were charged with murder, robbery, and assault. At Richardson's and Williams' joint trial, Williams' confession, which had been redacted to omit all indication that anyone other than he and Martin participated in the crime, was admitted into evidence, over Richardson's objection. The trial judge instructed the jury that Williams' confession could not be considered against Richardson. Richardson was convicted, and, on appeal, the appellate court affirmed. The Michigan Supreme Court denied further review, and Richardson filed a petition for writ of *habeas corpus*. Richardson was denied relief at the district court level, but the Sixth Circuit Court of Appeals reversed, holding that, in light of the inculpatory value of the confession when compared to the other evidence of Richardson's intent introduced at trial, Richardson's rights under the Confrontation Clause had been violated.

On grant of *certiorari*, the high Court reversed. In concluding that there was no *Bruton* violation under the circumstances of the case, the Court reasoned:

> There is an important distinction between this case and *Bruton,* which causes it to fall outside the narrow exception we have created. In *Bruton,* the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can

possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule.

Even more significantly, evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce. If limited to facially incriminating confessions, *Bruton* can be complied with by redaction—a possibility suggested in that opinion itself. If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial. The "contextual implication" doctrine articulated by the Court of Appeals would presumably require the trial judge to assess at the end of each trial whether, in light of all of the evidence, a nontestifying codefendant's confession has been so "powerfully incriminating" that a new, separate trial is required for the defendant. This obviously lends itself to manipulation by the defense—and even without manipulation will result in numerous mistrials and appeals.

*Richardson*, 481 U.S. at 208-09 (citations and footnote omitted).

More than a decade after *Richardson*, the high Court, in *Gray v. Maryland,* 523 U.S. 185 (1998), contemplated a prosecution in which the appellant's name in his non-testifying co-defendant's confession was replaced with either the word "deleted," or a blank space, and introduced at trial. Appellant John Gray's co-defendant, Anthony Bell, had confessed to police that he, Gray, and a third individual fatally beat a man. After the third individual died, Gray and Bell were tried jointly for murder. Although Bell did not testify, the trial court allowed a redacted version of his confession to be read into evidence by a detective. In reading the confession, the detective substituted Gray's and the third individual's name with the word "deleted" or "deletion." *Id.* at 188. Immediately after he read Bell's confession, the detective was asked whether, after obtaining the confession,

he was "able to arrest" Gray, and the detective responded in the affirmative. *Id.* at 188-89. Moreover, a written copy of Bell's confession was admitted into evidence, with the names of Gray and the third individual replaced by blank spaces separated by commas.

Gray was convicted, and the Maryland Court of Special Appeals reversed, finding the use of Bell's confession violated Gray's rights under *Bruton*. The state's high court disagreed, and reinstated Gray's conviction. On grant of *certiorari*, the United States Supreme Court reversed, concluding Gray was entitled to relief because, unlike the redacted confession in *Richardson*, Bell's confession "refers directly to the 'existence' of the nonconfessing defendant." *Id*. at 192. The Court expounded:

> Redactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result.
>
> For one thing, a jury will often react similarly to an unredacted confession and a confession redacted in this way, for the jury will often realize that the confession refers specifically to the defendant . . . . Consider a simplified but typical example, a confession that reads "I, Bob Smith, along with Sam Jones, robbed the bank." To replace the words "Sam Jones" with an obvious blank will not likely fool anyone. A juror somewhat familiar with criminal law would know immediately that the blank . . . refers to defendant Jones. A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to Jones, sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against Jones, for that instruction will provide an obvious reason for the blank . . . .
>
> For another thing, the obvious deletion may well call the jurors' attention specially to the removed name. By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation . . . .

*Id.* at 192-93.

The high Court in *Gray* acknowledged that, in the case before it, the jury would have had to use inference to connect the redacted statement to Gray. It explained, however, that

> inference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton*'s scope confessions that use shortened first names, nicknames, descriptions as unique as the "red-haired, bearded, one-eyed man-with-a-limp," *United States v. Grinnell Corp.*, [384 U.S. 563, 591 (1966)], and perhaps even full names of defendants who are always known by a nickname. This Court has assumed, however, that nicknames and specific descriptions fall inside, not outside, *Bruton*'s protection. *See Harrington v. California*, [395 U.S. 250, 253 (1969)] (assuming *Bruton* violation where confessions describe codefendant as the "white guy" and gives a description of his age, height, weight, and hair color).

*Id.* at 195. Thus, the Court reasoned:

> *Richardson* must depend in significant part upon the *kind* of, not the simple *fact* of, inference. *Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence introduced later at trial." The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson*'s words, "*facially* incriminat[es]" the codefendant. Like the confession in *Bruton* itself, the accusation that the redacted confession makes "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind."

*Id.* at 196 (emphasis original, citations omitted).

Most recently, on June 23, 2023, during the pendency of Appellant's appeal, the United States Supreme Court issued its decision in *Samia v. United States*, 599 U.S. 635 (2023). Therein, the appellant, Adam Samia, was tried jointly with two other individuals,

including Carl Stillwell, for offenses arising out of a murder-for-hire. Prior to trial, the government sought to introduce Stillwell's post-arrest confession, wherein he admitted that he was in the vehicle in which the victim was killed, but identified Samia as the shooter. As Stillwell was not going to testify at trial, the government proposed introducing the confession through the testimony of a Drug Enforcement Administration ("DEA") agent, who would present Stillwell's confession in a manner that eliminated Samia's name and excluded obvious indications of redaction. The federal district court granted the government's request, and, at trial, a DEA agent testified to the substance of Stillwell's confession, with all refences to Samia replaced with the term the "other person." Additionally, the district court instructed the jury that Stillwell's confession was only admissible against Stillwell and not against his co-defendants. All three individuals were convicted.

Samia appealed, asserting that the admission of Stillwell's confession violated his Confrontation Clause rights because other evidence presented at trial enabled the jury to immediately infer that the "other person" referred to in Stillwell's confession was, in fact, Samia. The Second Circuit Court of Appeals, relying on its prior decisions approving the practice of replacing a defendant's name in a non-testifying co-defendant's confession with a neutral noun or pronoun, affirmed.

On appeal, the high Court affirmed, holding that the admission of a co-defendant's redacted confession that (1) does not directly inculpate the defendant, and (2) is accompanied by a proper limiting instruction, does not violate the Confrontation Clause, even if the confession becomes incriminating when linked with other evidence introduced at trial. In a majority opinion written by Justice Thomas, the Court explained that the admission of a non-testifying co-defendant's confession which has been altered to remove a defendant's name, when coupled with a limiting instruction, is consistent with

historical evidentiary practice, and is "in accord with the law's broader assumption that jurors can be relied upon to follow the trial judge's instructions." *Id.* at 646.[6] The Court noted that *Bruton's* recognition of a "narrow exception," *id.* at 647, to this presumption applies only to confessions that directly implicate a defendant, and emphasized that, in *Richardson*, the Court declined to expand the *Bruton* rule to redacted confessions that inculpate a defendant when viewed in conjunction with other evidence.

Recognizing that the Court in *Gray* determined that a redacted confession that simply replaces a defendant's name with a blank space or other obvious sign of deletion is so similar to the unredacted statement in *Bruton* so as to require exclusion, the Court held that Stillwell's confession did not violate *Bruton* or *Gray*, and suggested that "it would not have been feasible to further modify Stillwell's confession to make it appear, as in *Richardson*, that he had acted alone." *Id.* at 653. The Court further opined:

> [E]diting the statement to exclude mention of the "other person" may have made it seem as though Stillwell and [the victim] were alone in the van at the time [the victim] was shot. Such a scenario may have led the jurors−who sat in judgment of both Samia and Stillwell−to conclude that Stillwell was the shooter, an obviously prejudicial result.

*Id.*

Finally, the Court determined that the "[t]he Confrontation Clause rule that Samia proposes would require federal and state trial courts to conduct extensive pretrial hearings to determine whether the jury could infer from the Government's case in its entirety that the defendant had been named in an altered confession," an approach the

---

[6] Chief Justice Roberts and Justices Alito, Gorsuch, and Kavanaugh joined the majority opinion. Justice Barrett authored an opinion concurring in part and concurring in the judgment. Justice Kagan authored a dissenting opinion, in which Justices Sotomayor and Jackson joined, and Justice Jackson authored a separate dissenting opinion.

Court suggested would be "burdensome" and "far from foolproof." *Id.* at 654 (citations omitted).

In rejecting Samia's argument that "the Government may choose to forgo use of the confession entirely, thereby avoiding the need for severance," the high Court explained that confessions are "essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.* at 655 (citation omitted). Further, the Court elaborated as to the additional benefits of joint trials:

> Joint trials have long "play[ed] a vital role in the criminal justice system," preserving government resources and allowing victims to avoid repeatedly reliving trauma. Further, joint trials encourage consistent verdicts and enable more accurate assessments of relative culpability. Also, separate trials "randomly favo[r] the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."

*Id.* at 654 (citations omitted).[7]

As noted above, in arguing that the admission of King's redacted statement violated *Bruton*, Appellant relies on this Court's decisions in *Johnson* and *Rainey*. In *Johnson*, the appellant and his co-defendant were tried jointly, and the redacted written confession of the co-defendant in which all references to the appellant were eliminated was admitted into evidence. On appeal, the appellant argued, *inter alia*, that redaction should not be permitted because it can never be done in a manner sufficient to protect the defendant's Sixth Amendment rights. In rejecting his argument, this Court stated: "The basic theory of redaction seems sound. If a confession can be edited so that it retains its narrative integrity and yet in no way refers to defendant, then use of it does not violate the principles of *Bruton*." *Johnson*, 378 A.2d at 860.

---

[7] The parties herein did not have the benefit of the high Court's decision in *Samia* at the time they filed their original briefs. On January 31, 2024, we ordered that the instant case be resubmitted, and instructed the parties to file supplemental briefs addressing the impact of *Samia*.

In *Rainey*, in the context of a Post Conviction Relief Act[8] petition alleging ineffectiveness of counsel claims, the appellant argued that the admission at a joint trial of his co-defendant's redacted confession, in which the appellant's name was replaced with an "X," accompanied by a jury instruction that the confession could only be used against the appellant's co-defendant, violated his Confrontation Clause rights under *Bruton*. In addressing the appellant's claims, we observed that, in *Johnson*,

> this Court approved of redaction as "an appropriate method of protecting defendant's rights under the *Bruton* decision." *Commonwealth v. Johnson*, 474 Pa. 410, 378 A.2d 859, 860 (1977) ("[i]f a confession can be edited so that it retains its narrative integrity and yet in no way refers to defendant, then use of it does not violate the principles of *Bruton*.").

*Rainey*, 928 A.2d at 227. Although the redaction in *Rainey* was inconsistent with the high Court's holding in *Gray* that redactions which merely replace a co-defendant's name with a blank space, word, or symbol, such as "X," that are obvious indications of alteration, and, thus, require the same treatment as unredacted statements under *Bruton*, we explained that *Gray* represented a new rule of law that should not be applied retroactively to the appellant's case. Thus, this Court ultimately denied Appellant relief on his *Bruton*-based ineffectiveness claim.

In the case *sub judice*, Appellant maintains that King's redacted statement failed to satisfy the rule set forth in *Johnson* and *Rainey*, which requires that a redacted statement "in no way refer" to the defendant. Appellant's Brief at 24. Specifically, Appellant claims that King's redacted confession "obviously referred directly to Appellant" because she and King were the only two individuals charged with conspiracy to commit homicide, and that charge "link[ed] them by its *prima facie* element" requiring an agreement between two people to commit a crime. *Id.* at 19. Appellant further suggests

---

[8] 42 Pa.C.S. §§ 9541-9546.

that, because she was referred to by name nine times throughout King's statement, there was no doubt as to the identity of the female actor referred to as "she" in the latter part of the statement. Finally, Appellant contends that "references to the 'position' and the 'slipper she had been using,' directly implicated [her] in the physical punishment and beating of [Tahjir]," and King's statement that his great grandmother was in her bedroom at the time the abuse of Tahjir occurred eliminated the only other female in the house as a suspect. *Id.* at 23.

Appellant additionally submits that the "express references [to Appellant] combined with the obvious inference that Appellant was the person referred to as 'she,' rendered the admission of King's statement" precisely the type of statement precluded by *Gray* and *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001).[9] Appellant's Brief at 24.

---

[9] In *Commonwealth v. Travers*, this Court considered whether the replacement of the appellant's name with the phrase "the other man" in his non-testifying co-defendant's confession, when combined with the trial court's cautionary charge to the jury, was sufficient to protect the appellant's right to confrontation. Following an examination of the high Court's decisions in *Bruton*, *Richardson*, and *Gray*, we concluded that, while *Richardson* did not specifically answer the question of whether a redaction that substitutes a neutral pronoun, such as "the other man," rather than a symbol of deletion, is sufficient to protect a defendant's Sixth Amendment rights, "the *Gray* Court's reasoning, including its distinction of *Richardson*, leaves little question that this sort of redaction is appropriate under the Sixth Amendment." 768 A.2d at 850-51. We further opined:

> Indeed, use of a neutral pronoun is not an obvious alteration at all: "For all the jury knew, these were [the non-testifying co-defendant's] actual words, not a modified version of them." The "other man" reference employed here was certainly not the sort of reference which, "even were the confession the very first item introduced at trial," obviously referred to the defendant. . . . Instead, as in *Richardson,* the redacted statement could become incriminating only through independent evidence introduced at trial which established the defendant's complicity and, even then, only if it is assumed that the jury ignored the court's charge.

*Id.* at 851 (citations omitted). Thus, we held that, because the statement "was not powerfully incriminating on its face," the replacement of the appellant's name with the phrase the "other man" in the non-testifying co-defendant's statement, in combination with the trial court's cautionary instruction to the jury, sufficiently protected the appellant's Sixth Amendment right to confrontation. *Id.*

Appellant avers that federal circuit case law supports a finding that King's redacted statement was inadmissible.

With respect to the impact of the high Court's decision in *Samia*, Appellant maintains:

> *Samia* leaves intact . . . *Gray's* holding that obvious redactions, "which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial" constitute a violation of the confrontation clause under *Bruton*.

Appellant's Supplemental Brief at 18. Appellant further submits that *Samia* "in no way effects [sic] this Court's prior holdings" in *Commonwealth v. Overby*, 909 A.2d 295 (Pa. 2002) (OAJC) (admission of a non-testifying co-defendant's statement, in which the defendant's name was replaced with an "X," expressly implicated the defendant and was reversible error), and *Commonwealth v. Markman*, 916 A.2d 586 (Pa. 2008) (holding that admission of a non-testifying co-defendant's tape-recorded confession, where references to defendant were dubbed over in a different voice to refer to "the other person," along with trial court's jury instruction that the recorded confession had been altered, violated *Bruton*). Appellant's Supplemental Brief at 18-19.

Moreover, Appellant contends that the redactions in the instant case are distinguishable from those in *Samia*, in that "Appellant is referenced by name 9 separate times in King's redacted statement," and, as a result, "the jury could immediately infer" who the term "she" referred to, even if the confession was the very first item introduced at trial. *Id.* at 20, 23. Lastly, Appellant argues that, in the event we determine that the admission of King's redacted confession was improper, the error cannot be considered harmless.[10]

---

[10] Appellant argues that the error cannot be considered harmless because: (1) the Commonwealth's evidence of her specific intent to kill was not overwhelming; (2) King's statements were not cumulative to other properly admitted evidence; and (3) the
(continued…)

The Commonwealth initially maintains that there was no *Bruton* violation in the instant case because King's redacted statement "neither directly nor powerfully implicated [Appellant] in any of the crimes committed against Tahjir." Commonwealth's Brief at 15. Rather, the Commonwealth suggests that, where King's redacted confession mentioned Appellant by name, or referred to "she," such references "primarily involved background information on the pair's relationship or other innocuous – and sometimes even favorable – references to her, such as her being a caretaker or her simply being a by-stander." *Id.* at 22.[11] Further, the Commonwealth suggests that any inference that Appellant was involved in the criminal activity could only have been drawn in light of the other properly admitted evidence, and, thus, admission of the redacted statement, which was accompanied by a limiting instruction, did not violate *Bruton*, based on *Samia*. *See* Commonwealth's Supplemental Brief at 15-16.

The Commonwealth also challenges Appellant's reliance on decisions by the Third Circuit as non-binding on this Court, specifically noting that this Court, in *Commonwealth*

---

prosecutor, in his closing argument, asked the jury to use a portion of King's statement against Appellant.

[11] The Pennsylvania District Attorneys Association and the Office of the Attorney General of Pennsylvania ("OAG") filed *amicus* briefs in support of the Commonwealth, and both entities requested permission to file supplemental *amicus* briefs addressing the impact of *Samia*, which we hereby grant. Like the Commonwealth, the OAG argues that the admission of King's redacted statement did not violate *Bruton* because, while it did not eliminate any reference to Appellant's existence, it did not implicate her in the death of Tahjir, and only evidence extrinsic to the redacted statement – Appellant's own confession – allowed the jury to find her guilty. OAG's Brief at 16. The OAG further notes that, although King's redacted statement indicates that he hit Tahjir with the slipper "she had been using," the statement does not indicate that Appellant was using the slipper to *abuse* her son. *Id.* at 15. In their supplemental briefs, *Amici* submit that *Samia* does not alter the rule that a co-defendant's redacted statement does not violate *Bruton* unless the statement itself both identifies and incriminates the defendant. Specifically, the OAG avers that *Samia* invalidates Appellant's claim that *Bruton* was violated in this case because King's use of her name, in conjunction with other evidence at trial, clearly implicated her, as *Samia* makes clear that *Bruton* "is triggered only if the co-defendant's statement *in and of itself* indicated that she took part in the crime." OAG's Supplemental Brief at 4 (emphasis original).

*v. Daniels*, 104 A.3d 267 (Pa. 2014), rejected the Third Circuit's criticisms of this Court's interpretation of *Bruton* and its progeny. The Commonwealth suggests that, even if we are persuaded by those decisions, there was no *Bruton* violation here, as those cases are distinguishable because they involved powerfully incriminating statements against the defendants, whereas the instant case does not.

Finally, the Commonwealth argues that, even if there were a *Bruton* violation, the error was harmless in light of the overwhelming evidence of Appellant's guilt, including her own confession, the testimony of the medical expert, and the testimony of her own family members. Commonwealth's Brief at 49 (citing, *inter alia*, *Schneble v. Florida*, 405 U.S. 427 (1972) (even if admission at trial of co-defendant's statement constituted a *Bruton* violation, admission was harmless in light of overwhelming properly admitted evidence of defendant's guilt); *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992) (even if redacted statement at issue did not sufficiently protect defendant's interests, any error was harmless given overwhelming evidence implicating defendant)).

Upon review, we conclude that the admission of King's redacted confession did not violate Appellant's Confrontation Clause rights. Appellant's argument is premised on a selective, and flawed, reading of *Johnson* and *Rainey* − namely, that the mere mention of her existence in King's redacted confession violates *Bruton*. However, *Bruton* is implicated only when a non-testifying co-defendant's statement directly and powerfully implicates the defendant in the crime. *See*, *e.g.*, *Commonwealth v. Brown*, 925 A.2d 147, 157 (Pa. 2007) (explaining that *Bruton* held that, where a non-testifying co-defendant's confession "directly and powerfully implicates the defendant in the crime," an instruction to the jury to consider the evidence only against the co-defendant is insufficient to protect the defendant's confrontation rights); *Richardson,* 481 U.S. at 208 (distinguishing between the co-defendant's confession in *Bruton*, which "'expressly implicat[ed]' the

defendant as his accomplice," and a confession which is "not incriminating on its face, and became so only when linked with evidence introduced later at trial").

Indeed, in both *Johnson* and *Rainey*, the decisions on which Appellant principally relies, this Court recognized that *Bruton* is implicated only when a redacted confession of a non-testifying co-defendant incriminates or implicates the defendant in the crime charged. *See Johnson*, 378 A.2d at 861 ("[i]n order for a redacted confession to be rejected as inculpatory by way of inference, it must have some incriminatory impact" and "[w]here . . . the confession does not contain a trace or hint of participation in the crime by appellant, redaction is permissible"); *Rainey*, 928 A.2d at 227 (explaining that, under *Bruton*, a defendant's Confrontation Clause rights are violated "when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial").[12]  In the case *sub judice*, King's redacted confession did not incriminate Appellant, nor did it identify her as a participant in the beating of Tahjir.

As explained by the trial court below,

> [t]he redacted statement only referenced criminal conduct related to King.  The statement as read gave no suggestion of another person engaging in criminal conduct.  The statement only referenced Appellant as being King's girlfriend and pregnant with his child, and that she was at King's house on January 22, 2018 and she fed the kids that morning.  The information in the statement relating to the abuse inflicted upon [Tahjir], the burns inflicted on him in the shower, and [Tahjir's] demeanor after the shower, was related to co-defendant King only.  The statement read clearly and smoothly, and it retained its narrative integrity despite the redactions.

Trial Court Opinion, 2/10/20, slip op. at 23-24.  Our review of the trial transcript confirms the trial court's determination.  Indeed, even if Appellant's name had not been replaced

---

[12] Appellant's reliance on *Markman* and *Overby* is also misplaced, as in both of those cases, the redacted confessions of the codefendants expressly implicated the defendants.

with a pronoun, King's redacted statement still would not have incriminated her, or identified her as taking part in the beating of Tahjir.

Additionally, with respect to Appellant's specific objections to the references to the "position" and "the slipper she had been using" contained in King's redacted statement, we first note that there was no suggestion that Tahjir's placement in the "position" resulted in his death. Further, King's reference to the "slipper she had been using" did not directly implicate Appellant in the beating of Tahjir, as the statement could be read as referring simply to a slipper Appellant had been *wearing*.

Finally, to the extent Appellant argues that admission of King's redacted confession was improper because it allowed the jury to *infer* that she was the individual with whom King conspired, as discussed above, the high Court recently reiterated in *Samia* that the admission of a co-defendant's redacted confession that does not directly inculpate the defendant, and is accompanied by a proper limiting instruction, does not violate the Confrontation Clause, even if the confession becomes incriminating when linked with other evidence introduced at trial.[13]

As King's redacted statement did not directly or powerfully implicate Appellant by identifying her as a perpetrator of the crime, and the trial court issued a proper limiting

---

[13] Today we also issued our decision in *Commonwealth v. Jones*, 31 EAP 2021, J-18-2024. In that case, Michael Jones challenged the admission at trial of the redacted statement of his non-testifying co-defendant, Syheed Wilson, on the grounds that it violated his Sixth Amendment Confrontation Clause rights. Specifically, Jones argued that Wilson's statement, though redacted to replace references to Jones with the phrase "my friend," directly incriminated him because it made numerous direct references to his existence, which, in light of other testimony presented at trial, allowed the jury to infer that he was the "friend." This Court concluded that the admission of Wilson's redacted statement violated *Bruton* because: (1) Wilson's statement directly incriminated Jones; (2) Wilson's statement identified Jones by his likeness; and (3) the jury had been informed that Wilson's statement had been redacted. *Jones*, *slip op.* at 2. *Jones* does not afford Appellant relief, however, because, as discussed above, King's redacted confession did not incriminate Appellant, nor identify her as a participant in the beating of Tahjir.

instruction to the jury, we hold that the admission of King's redacted statement did not violate Appellant's rights under the Confrontation Clause.[14]

Order affirmed.

Justices Donohue, Dougherty, Mundy, Brobson and McCaffery join the opinion.

Justice Wecht files a concurring opinion in which Justice McCaffery joins.

---

[14] In light of our determination, there is no basis for us to address the parties' arguments regarding harmless error.