**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 46 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 954 EDA |
| | : | 2022 entered on November 14, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| RASHEED MALCOLM, | : | 51-CR-0001309-2020 entered on |
| | : | March 28, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

**OPINION ANNOUNCING THE JUDGMENT OF THE COURT**

**JUSTICE MUNDY**                                    **DECIDED: February 18, 2026**

**I. Introduction**

In this appeal by allowance, Appellant Rasheed Malcolm challenges the Superior Court's decision affirming the admission of several statements in Malcolm's police interrogation video, in which detectives made accusatory statements and opinions regarding Malcolm's guilt and involvement in a fatal shooting. For the reasons that follow, we agree that these statements were properly admitted, although our rationale differs from the Superior Court. We therefore affirm the Superior Court's order.[1]

---

[1] After oral argument, Malcolm filed two separate motions for post-submission communication pursuant to Pa.R.A.P. 2501. The first motion included a request to correct the oral argument record. The second motion alerted the court of additional persuasive authority. Rule 2501 prohibits the filing of briefs, memorandums, and letters to the Court following oral argument unless "expressly allowed at bar at the time of argument." (…continued)

## II. Background

This case stems from the shooting death of Kevin Harris ("the victim"). On December 22, 2018, the victim was out celebrating the birthdays of his twin aunts at Kif's Bar located on Market Street in Philadelphia. When the bar closed, the partygoers gathered outside on the sidewalk to say their goodbyes, at which point the victim was fatally shot, once in the head and once in the chest. Another individual, Donny Williams, was also shot but survived his injuries. Ramona Harris, one of the victim's aunts, recalled seeing two shooters, one of whom was tall, skinny, and wearing a gray hooded sweatshirt.

Following the shooting, police officers processed the scene and recovered a total of eleven fired cartridge casings ("FCCs") from two different guns.[2] They also recovered nearby surveillance footage from three cameras in an attempt to identify the shooters. The video footage depicted one individual wearing a gray zipper hoodie, black boots, black pants, and wired white earbuds. This individual can be seen circling the block several times where the incident occurred in the moments leading up to the shooting. The video footage then shows that individual walk through the crowd that had exited the bar. He then approaches the victim from behind and shoots him twice at close range before fleeing. The shooter is then seen carrying a firearm in his right hand while running from the scene.

---

Pa.R.A.P. 2501. It also permits parties to alert the Court of a change in status of authorities "[i]f any case or other authority relied upon in the brief of a party is expressly reversed, modified, overruled or otherwise affected so as to materially affect its status as an authoritative statement of the law for which originally cited in the jurisdiction in which it was decided[.]" Malcolm's motions are denied, as neither of these requests fall under Rule 2501.

[2] Six of the FCCs came from a .380-millimeter firearm, and the remaining five came from a 9-millimeter firearm.

Detective James Burns of the Philadelphia Police Department's Homicide Unit was assigned to the case. Following an investigation, Detective Burns was unable to identify the shooter and, consequently, sent out a patrol alert, which included a screenshot of the shooter from the surveillance footage.[3] Malcolm was brought in for questioning as a result. Detective Burns and Detective John Harkins conducted a videotaped interview during which Malcolm consented to a search of his bedroom for items related to the incident. As a result of that search, officers discovered a gray hoodie, black boots, and a pair of white corded headphones. The gray hoodie and the black boots were consistent with that seen in the surveillance video. Malcolm denied ownership of the hoodie, claiming it belonged to a friend. The police submitted the gray hoodie for testing, which revealed the presence of particles consistent with gunshot residue on the right sleeve. The sweatshirt was also found to contain the DNA of three individuals, at least one of whom was male, but the test was inconclusive as to whether the DNA belonged to Malcolm. The boots and earbuds were also submitted for testing, the results of which were similarly inconclusive.

Approximately one month after Malcolm's interview, Officer Robert Lamanna was interviewed by police. He identified the suspect pictured in the patrol alert as Malcolm. Malcolm frequented Officer Lamanna's assigned police district. Officer Lamanna had also seen Malcolm many times through social media. Once shown the surveillance footage, Officer Lamanna again identified Malcolm based on his facial features, beard, gate, and exceptional height.

Malcolm was subsequently charged with first-degree murder and related offenses. On March 21, 2022, Malcolm proceeded to a jury trial. On the second day of trial, Officer

---

[3] After the shooting, Detective Burns met with Williams, the surviving victim, in the hospital but was unable to locate or speak with him thereafter. Detective Burns was unsuccessful in locating other witnesses or getting them to provide any information helpful to the case.

Lamanna testified regarding his identification of Malcolm. Officer Lamanna explained that he was assigned to a police district frequented by Malcolm, whom he had the opportunity to see in person more than approximately ten times. He also viewed Malcolm through social media hundreds of times. Based on these sightings, Officer Lamanna believed Malcolm was the person depicted in the patrol alert. He additionally identified Malcolm as the individual in the surveillance footage based on his facial features, beard, gate, and exceptional height. N.T. Trial Vol. 3, 3/23/22, at 17-21, 25-40. Officer Lamanna was cross-examined by defense counsel, which included questions about the propriety of Officer Lamanna's identification. *Id.* at 41-52.

Relevant to this appeal, the Commonwealth also sought to admit at trial select portions of Malcolm's videotaped police interrogation through the testimony of Detective Burns. The Commonwealth provided the interrogation video to the defense before trial and indicated which portions it intended to play for the jury. Defense counsel did not file a motion *in limine* challenging specific portions of the video or otherwise formally object to admission of the video prior to trial. It does appear from the record that both parties discussed those portions of the video that would be played at trial and those portions that would be excluded. *See* N.T. Trial Vol. 4, 3/24/22, at 31-33.[4]

At trial, the Commonwealth began playing the video, and defense counsel objected and moved to strike soon thereafter. It is unclear from the record the specific statement to which defense counsel objected or the basis for the objection.[5] *Id.* at 29. The court

_____

[4] Malcolm filed a motion *in limine* seeking to preclude "narration of any video" but did not challenge any portions of the interrogation video at issue in this appeal. Motion *in Limine*, 3/1/21, at 1.

[5] The transcript indicates that the Commonwealth began playing the video but does not reference the statement that gave rise to the objection. The corresponding video time stamp noted therein however appears to align with Detective Burns telling Malcolm: "You were picked up on surveillance footage." *See* N.T. Trial Vol. 4, 3/24/22, at 28-29; (…continued)

overruled this objection without argument, and the Commonwealth continued playing the video for the jury. Shortly thereafter, the trial court stopped the video *sua sponte* and the following exchange took place:

> The Court: We are going to stop this here. I don't know how many times he will say this and nobody told me but, ladies and gentlemen, for our purposes, all you can consider is there is one person that came in and said that that was [] [Malcolm] on the video and that was the police officer who testified yesterday[,] [Officer Lamanna]. So[,] [ ] [D]etective [Burns] telling [Malcolm] people, plural, you are to disregard any of that. He is a detective. He is doing an interview. Sometimes –
>
> [Defense Counsel]: Well, not only that, [y]our Honor, it is not accurate at all because no one made an identification and [the detective] is telling them that they did. That is totally disingenuous and I think the jury should know that.
>
> . . .
>
> The Court: There is a person who made an identification in the video. It was the witness who testified. It was a police officer. So[,] the detective is doing an interview and that is how the detective interviews go sometimes but forget the people, police. You can only rely on what came from the witness stand. That was one police officer you heard. Will [the video] keep doing this because no one told me [the detectives] will say people?

*Id.* at 29-31. As illustrated above, the trial court found it problematic that Detective Burns indicated "people" had identified Malcolm as the suspect in the surveillance footage when only one witness, Officer Lamanna, would be offering such testimony at trial.[6] The trial court dismissed the jury from the courtroom and the discussion continued:

---

Interrogation Video, 4/11/19, at 6:07:23 – 6:07:27. Because we have been able to discern which statement counsel objected to by reviewing the interview video at the time stamps provided in the transcript, we do not find waiver. We remind defense counsel, however, that it is not our duty to piece together the record and make assumptions about what evidence is being contested.

[6] Relevantly, the Commonwealth had filed a motion *in limine* requesting that five different police officers be allowed to identify Malcolm as the suspect in the surveillance footage. The trial court denied the motion in part and granted the motion in part. Officer Lamanna was ultimately the only Commonwealth witness who identified Malcolm via the surveillance video at trial.

The Court: Why didn't anybody tell me that it was on there?

[The Commonwealth]: Your Honor, I gave [defense counsel] a transcript of this entire interview. I told him exactly what video times I was using. We discussed what he didn't want in there and I took everything he said he didn't want out.

The Court: Start with relevance and then go to probative versus prejudicial, [c]ounsel. You are going to have to fix it. We can't have this detective sitting there in front of the jury saying and people and lots of police officers. Will he start naming witnesses that don't show up?

[The Commonwealth]: No, [y]our Honor.

The Court: Well, I don't know that. You will need, [defense counsel] and you, if you have to cut it in spots, go ahead.

[The Commonwealth]: I literally did that. This is the e-mail I sent to [defense counsel] cutting out everything he said he didn't want in there.

The Court: Well, you didn't cut that out.

[The Commonwealth]: He didn't say he didn't want it. He told me he read the entire transcript.

[Defense Counsel]: I got the transcription the other day, [y]our Honor.

[The Commonwealth]: Last week.

[Defense Counsel]: I went all through this. There was no thought that they were going to put this in at this time. I would think that that would be absolutely –

[The Commonwealth]: I actually wrote in here what we discussed.

The Court: All right. So[,] you two go back through it. If there are things in here he is saying – I don't want to hear him say names of witnesses' who didn't turn up into this courtroom or the person who was shot in the stomach, who didn't even turn up in this courtroom, and then he gets to put their statements in.

[The Commonwealth]: No. He is going to say did the surviving victim identify him. He is going to ask that question.

The Court: He can ask whatever he wants. I don't want any information coming from that detective's mouth or the one next to him that comes from

somebody who didn't turn up in this courtroom to testify. Check it out real quick.

[Defense Counsel]: All I am suggesting to [y]our Honor when you go through the transcript, there is a continuation of this about this is you, this is you. This is the witnesses – [Detective Burns] says there are witnesses who pointed [Malcolm] out. The fact of the matter is there is no witness –

[The Commonwealth]: I am not playing any parts of that.

The Court: Go through it. It's not my job. It's your job to go through it.

*Id.* at 32-34. The Commonwealth and defense counsel took an opportunity to discuss what portions of the video would be played for the jury. Afterwards, the Commonwealth informed the trial court:

[The Commonwealth]: Your Honor, [defense counsel] and I disagreed over one of the other rulings that you made. I believe that you said that the part of the statement where the detective said we believe it's you in the video, we believe we have the right person, we believe it's you in the video, that was okay because that is what the detective said.

The Court: Yes, he can say that.

[Defense Counsel]: Well, I object to that [y]our Honor.

The Court: That's overruled.

*Id.* at 35.

Defense counsel interjected only once more during the course of the interrogation video being played for the jury.[7] As the video continued to play, Detective Burns and Detective Harkins made various additional statements expressing their disbelief regarding Malcolm's account of events and his assertions of innocence. The specific statements with which Malcolm now takes issue are reproduced below.

---

[7] Similar to the other statement challenged by defense counsel, the transcript does not reference the statement that gave rise to this objection, but the time stamp noted therein appears to align with Detective Burns telling Malcolm: "I'm telling you that I know this is you. That's what I'm telling you [Malcolm]." *See* N.T. Trial Vol. 4, 3/24/22, at 28-29; Interrogation Video, 4/11/19, at 6:18:15 – 6:18:40.

At the conclusion of trial, the jury found Malcolm guilty of first-degree murder, violations of the Uniform Firearms Act, and possessing an instrument of crime. He was sentenced to life imprisonment without the possibility of parole for first-degree murder and no further penalty for the remaining offenses. Malcolm did not file post-sentence motions but did file a timely notice of appeal. On appeal, Malcolm argued, *inter alia*, that the trial court erred or abused its discretion by overruling defense counsel's objection to various statements in the interrogation video wherein the detectives expressed their opinions and beliefs regarding his assertions of innocence, in contravention with the Superior Court's decision in *Commonwealth v. Kitchen*, 730 A.2d 513 (Pa. Super. 1999). Those statements are as follows:

1. Detective Burns: "You were picked up on surveillance footage."

2. Detective Burns: "I don't believe that we [have the wrong guy]."

3. Detective Burns: "I'm telling you that I know that this is you. That's what I'm telling you [Malcolm]."

4. Detective Burns: "You were right on 62nd Street at this time."

5. Detective Burns: "I showed you the photo and you looked and you said no, that's not me, and I said it is you."

6. Detective Harkins: "We checked the cameras on 62nd Street and you were out there."

7. Detective Burns: "I know that you were right there."

8. Detective Harkins: "Do you know how absurd that sounds."

9. Detective Burns: "You're not building a lot of points on your behalf."

10. Detective Burns: "You're a 25-year-old kid. I find it very suspicious that you wouldn't have a cellphone at some point."

11. Detective Burns: "Your story keeps evolving, changing, and everything else with your [phone] numbers."

12. Detective Burns: "Another reason why you would have something on your head to cover up that [tattoo] on your head. That's exactly what I'm thinking."

13. Detective Burns: "We're quite confident we have the right person here."

Video Interrogation, 4/11/19.[8, 9]   The Superior Court affirmed Malcolm's judgment of sentence in a unanimous, unpublished memorandum.  *See Commonwealth v. Malcolm*, 954 EDA 2022; 2023 WL 7548788 (Pa. Super. filed Nov. 14, 2023).  The panel explained that it reviews a trial court's evidentiary decisions for an abuse of discretion, which "occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record."  *Id.* at *10 (quoting *Commonwealth v. Montalvo*, 986 A.2d 84, 94 (Pa. 2009)).  The panel additionally noted that "a discretionary ruling cannot be overturned simply because a reviewing court disagrees with a trial court's conclusions."  *Id.* (quoting *Commonwealth v. O'Brien*, 836 A.2d 966, 968 (Pa. Super. 2003)).

The panel went on to consider Malcolm's reliance on *Kitchen*.  The panel explained that *Kitchen*, discussed more fully *infra*, involved a similar challenge to the admission of accusatory police statements made in multiple interrogation videos.  The *Kitchen* court relevantly determined that the Commonwealth was required to redact those statements in which troopers either directly or indirectly accused Kitchen of lying, reasoning such statements were akin to a "prosecutor's personal opinion, either in argument or via witnesses from the stand, as to the guilt or innocence of a criminal defendant, which is

---

[8] These statements appear at the following intervals in the order in which they are listed: (1) 6:07:23-6:07:27; (2) 6:14:25-6:14:31; (3) 6:18:15-6:18:23; (4) 6:20:02 6:20:08; (5) 6:31:22-6:31:30; (6) 6:39:39-6:39:43; (7) 6:49:53-6:50:07; (8) 6:52:58-6:53-03; (9) 7:14:20-7:14:29; (10) 7:15:53-7:16:00; (11) 7:38:02-7:38:07; (12) 7:46:14-7:46:20; (13) 13:25:14-13:25:44.

[9] Malcolm challenged one additional statement before the panel but has since conceded it was permissible.

inadmissible at trial." *Id.* at *11 (citing *Kitchen*, 730 A.2d at 521) (additional citation omitted).

Applying the foregoing, the instant panel found Malcolm's contested statements distinguishable from those in *Kitchen*. Despite acknowledging that *Kitchen* found inadmissible statements containing direct and indirect accusations of untruthfulness, the panel reasoned that "none of the challenged statements directly accused [Malcolm] of lying or untruthfulness similar to the statements made in *Kitchen*[,]" and therefore did not require redaction. *Id.* at *12. The panel also pointed out that Malcolm responded to these contested statements by repeatedly maintaining his innocence, making his responses and the circumstances around them properly before the jury for assessing Malcolm's credibility. *Id.* at *13. Lastly, the panel alternatively found that, to the extent the instant statements indirectly accused Malcolm of lying, their admission was harmless in light of Officer Lamanna's identification, the fact that Officer Lamanna was available for cross-examination, and the trial court's repeated reminders that the jury was the ultimate factfinder. *Id.* (citing *Commonwealth v. Williams*, 274 A.3d 722, 735 (Pa. Super. 2022) (explaining harmless error standard)). Accordingly, the Superior Court affirmed Malcolm's judgment of sentence.

### III. Issues

Malcolm appealed to this Court, and we granted review to address the following:

(1) Did the Superior Court err in affirming the trial court's admission of [Malcolm's] videotaped interrogation, over [Malcolm's] objection?

(2) Where videotaped interrogations are sought to be admitted at trial, what steps should the parties and trial courts take to reduce undue prejudice while providing appropriate context so that jurors can appropriately weigh the evidence?

*Commonwealth v. Malcolm*, 319 A.3d 503 (Pa. 2024) (per curiam).

### IV. Parties' Arguments

Malcolm relies on the fact that prosecutors are prohibited from expressing personal beliefs regarding a witness's credibility to argue that police officers should be precluded from doing the same. Appellant's Brief at 21 (citing *Commonwealth v. D'Amato*, 526 A.2d 300, 309 (Pa. 1987); *Commonwealth v. DiNicola*, 468 A.2d 1078, 1081 (Pa. 1983)). He argues that there are similar dangers in allowing police officers to testify regarding a defendant's credibility. *Id.* at 24 (citing *Commonwealth v. McClure*, 144 A.3d 970, 977 (Pa. Super. 2016) (holding inadmissible detective's statement regarding defendant's credibility, reasoning it could allow jury to find "unwarranted appearance of credibility" and rejecting harmless error)). Malcolm also relies on the fact that the *Kitchen* panel identified two "forbidden categories" of evidence, specifically "instances where the police, either directly or indirectly, accused [the defendant] of lying" and "instances where the police offer 'an opinion as to the guilt of [the defendant].'" *Id.* at 25 (citing *Kitchen*, 730 A.3d at 521-22). Finally, Malcolm argues that our rigorous Rule 403 standard should accord significant weight to the detective's "unwarranted appearance of authority" against the marginal probative value of their "repetitive declarations of guilt and deceit." *Id.* at 25-26 (citing Pa.R.E. 403). Accordingly, Malcolm argues the statements in this case are the exact type that should be excluded due to their prejudice. Malcolm further disagrees with the panel's interpretation of *Kitchen*. The instant panel concluded the detectives' remarks were admissible because they did not contain specific, but rather implied, accusations of untruthfulness. Malcolm avers, however, that the statements at issue in this case are indistinguishable from those in *Kitchen*. *Id.* at 28.

Malcolm additionally disagrees with the panel's alternative conclusion that admission of the contested statements was harmless. He notes that any curative instruction provided by the trial court was not directed specifically at Detective Burns or Detective Harkins' statements. According to Malcolm, the Superior Court also found that

the detectives' statements in the video were based on Officer Lamanna's identification of Malcolm from the video. *Id.* at 33. He states that this cannot be true considering the interrogation occurred prior to Officer Lamanna's identification. Finally, though not a basis for the Superior Court's finding of harmless error, Malcolm maintains that the properly admitted evidence was not overwhelming, making the prejudice that resulted from these statements significant enough to contribute to the verdict. *Id.* at 33-34.

Next, Malcolm maintains that "nothing short of complete redaction" is sufficient to ameliorate the prejudice caused by these accusatory police statements. *Id*. at 37. He alternatively suggests a balancing test under Rule 403, with certain exceptions. Id. at 57. Specifically, Malcolm argues that where an accusatory statement is not directly connected to a question or if the defendant's answer to an accusatory statement may be understood on its own, then the accusatory statement should be excluded. *Id.* at 57-58. Malcolm also avers that ending a portion of a videotaped interrogation at the point of a police accusation is always unfairly prejudicial. *Id.* at 60. Finally, Malcolm believes a curative instruction is warranted where such statements are admitted. This instruction should tell jurors to disregard police opinions as to the guilt or credibility of the defendant and also inform the jury that police use a variety of interview techniques, including false statements, to elicit information. *Id.* at 62. Based on the foregoing, Malcolm asks this Court to reverse and remand for a new trial.

The Commonwealth agrees with Malcolm that the above statements should have been excluded. Commonwealth's Brief at 10. It acknowledges that this is an issue of first impression for us but argues we should adopt the Superior Court's decision in *Kitchen*. *Id*. at 10-11 (citing *Kitchen*, 730 A.2d at 521-22). The Commonwealth additionally observes that many of our sister states have addressed this issue but have not adopted a uniform rule, understandably so considering "that the evidentiary rules in these various

states differ significantly." *Id.* at 11 (citation omitted). Nevertheless, considering our rules of evidence and analogous precedent, the Commonwealth "agrees that instances in which the police accuse suspects of lying or opine that they are guilty must be redacted from videotaped interrogations introduced at trial." *Id.* at 11-12.

As such, the bulk of the Commonwealth's argument addresses harmless error. The Commonwealth maintains that the trial court's instructions informing the jury that it is the ultimate factfinder and judge of credibility were sufficient to ameliorate any prejudice. According to the Commonwealth, these instructions made clear to the jury the opinions of the detectives and police officers regarding Malcolm's guilt "were irrelevant, and that it was the jurors' conclusions from their personal observations of the surveillance video that controlled their fact-finding." *Id.* 11-14. The Commonwealth continues that any prejudice was further minimized by untainted identification evidence by Officer Lamanna. *Id.* at 14.

With respect to the second issue, the Commonwealth maintains that redaction is an appropriate solution in future cases where police personnel offer similar opinions and make accusations. *Id.* at 16-17. In doing so, the Commonwealth first makes clear that this solution does not apply when the opinions of guilt or accusations of lying appear in leading questions or open-ended questions. With respect to the latter, the Commonwealth believes it would be improper to redact Malcolm's "own freely spoken words." *Id.* at 18. It clarifies that "once [Malcolm] chose to respond, his response and the circumstances surrounding that response were admissible to evaluate the credibility of his statements." *Id.* at 18 (citing *Hawkins*, 701 A.2d at 509). Thus, the Commonwealth asks this Court to affirm Malcolm's judgment of sentence.[10]

---

[10] The Defender Association of Philadelphia ("Defender") filed an amicus brief. It asks this Court to adopt the Superior Court's decision in *Kitchen* and "announce of bright line rule of *per se* inadmissibility, regardless of whether the statements are direct accusations of lying, or merely insinuations of lying" because both kinds of statements have the same prejudicial effect. Defender Amicus at 11. To illustrate this point, the Defender provides (…continued)

## V. Analysis

Appellant's first issue before us concerns the admission of accusatory statements and opinions made by police officers during an interrogation. "The threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021) (citation omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401(a), (b). A court may nevertheless "exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, Comment.

Significantly, "[t]he admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse

---

four case studies involving interrogations that include law enforcement officers making accusatory statements to a suspect. *Id.* at 8-16. It then provides examples of the ways in which our courts have been "chipping away" at *Kitchen*. *Id.* at 16 (citing *Commonwealth v. Kratz*, 150 EDA 2020; 2021 WL 1725547 (Pa. Super. filed April 30, 2021) (unpublished memorandum); *Commonwealth v. Reeves*, 1566 WDA 2017; 2019 WL 3383703 (Pa. Super. filed July 25, 2019) (unpublished memorandum)). Put simply, the Defender argues: "If a detective cannot get on the witness stand, look at a factfinder, and utter the words that are on the videotapes recording, those statements should be kept out." *Id.* at 17.

The Pennsylvania Innocence Project and the Innocence Project also filed a joint amicus brief. They assert that accusatory interrogation techniques, like those in this case, are coercive, produce prejudicial content that is not useful in securing accurate information, and create a risk of false confession. Innocence Project Amicus at 7-12. They next ask this Court to adopt a policy of complete redaction where police make statements or provide opinions asserting or implying guilt or disbelief in a defendant's denials. They alternatively propose curative instructions, while noting the limitations of such instructions. *Id.* at 13-27.

of that discretion." *Commonwealth v. Smith*, 325 A.3d 513, 518-19 (Pa. 2024) (citing *Commonwealth v. Le*, 208 A.3d 960, 970 (Pa. 2019)). "An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality." *Id.* at 519 (citing *Commonwealth v. Talley*, 265 A.3d 485, 530 (Pa. 2021)).

Both Malcolm and the Commonwealth maintain that admission of the statements recounted above was improper. Malcolm's argument relies heavily on the Superior Court's decision in *Kitchen,* which we have been asked to adopt. The Commonwealth acknowledges there is no clear consensus as to the admissibility of similar statements among our sister states and capitulates to Malcolm's suggestions that we adopt *Kitchen*. We are not so convinced and decline the parties' invitation to adopt *Kitchen*. As noted above, the *Kitchen* court extended the prohibition that prosecutors may not offer personal opinions as to the guilt of the accused either in argument or in testimony from the witness stand to also include statements made during police interrogations later admitted at trial. *See Kitchen*, 730 A.2d at 521 (citing *Commonwealth v. Henry*, 706 A.2d 311 (Pa. 1997); *Commonwealth v. Peterkin*, 649 A.2d 121 (Pa. 1994)).

By way of background, Kitchen was charged with homicide and criminal conspiracy to commit homicide related to the killing of her paramour, Donald F. Reiman, Jr., who was discovered shot to death by a fishpond in Northampton County. *Kitchen*, 730 A.2d at 515. The police arrested Kitchen's other paramour, John Mead, who admitted to shooting Reiman but insisted the plan was orchestrated by Kitchen. *Id.* The police interviewed Kitchen during the course of their investigation, and the Commonwealth later sought to admit at trial three separate videotapes of this interview in their entirety. *Id.* at 516. Kitchen filed a motion *in limine* seeking to exclude the tapes, arguing that "the total effect of the videotapes was impermissibly inflammatory and prejudicial to the defense." *Id.*

The trial court granted Kitchen's motion in part and invited the Commonwealth to redact the videotapes consistent with its ruling. *Id.* at 517. Relevant herein, the Superior Court agreed with the trial court's exclusion of several statements in which the police either directly or indirectly accused Kitchen of lying. In a cursory analysis, the Superior Court determined that these statements "were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial." *Id.* at 521 (citing *Commonwealth v. Peterkin*, 649 A.2d 121 (Pa. 1994)).[11]

This Court has yet to address the propriety of Kitchen's holding in this regard. At the outset, it is important to recognize that the line of cases finding that prosecutors are prohibited from offering personal beliefs as to the truth or falsity of a defendant's evidence at trial were decided in the context of prosecutorial misconduct claims. *See e.g., Henry*, 706 A.2d 381-82; *Peterkin*, 649 A.2d at 128-29. Where there is an issue concerning prosecutorial misconduct on appeal, the improper statement does not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. D'Amato*, 526 A.2d 300, 309 (Pa. 1987) (citations omitted). This Court has explained that "[t]he essence of a finding of prosecutorial misconduct is that the prosecutor, a person who holds a unique position of trust in our society, has abused that trust in order to

---

[11] *Kitchen* also involved two additional categories of statements, neither of which are relevant here. One was accusatory police inquiries that prompted an answer by Kitchen, and the other was accusatory police inquiries to which Kitchen did not respond. The court held that the former did not need to be redacted from the video, but the latter did because such statements "constitute[d] an improper reference to [Kitchen's] pre-arrest silence." *Kitchen*, 730 A.2d at 522. Neither of these categories are relevant to this appeal. As such, we do not comment on the propriety of Kitchen's ruling in this regard.

prejudice and deliberately mislead the jury." *Commonwealth v. Pierce*, 645 A.2d 189, 197 (Pa. 1994) (citations omitted).

We decline to extend this framework to similar statements made by police personnel. *Kitchen*'s rationale for extending this proposition and the manner in which it executes the same is shortsighted. To begin, *Kitchen* relies on the prohibition against vouching or bolstering but fails to undertake the test to determine whether an improper prosecutorial comment meets the prejudice threshold to warrant a new trial. *See Kitchen*, 730 A.2d at 521. Instead, *Kitchen* appears to conclude that such statements are categorically inadmissible and, absent exclusion, always carve the way for a new trial. This is not to say that statements made by police offering opinions or making accusations about a defendant's involvement in a crime are automatically permissible, but we decline to create a categorical exclusion when the same does not apply in the context of prosecutorial misconduct.

We find it more appropriate to assess the admissibility of these statements on a case-by-case basis under our existing rules of evidence, rather than draw a comparison with claims of prosecutorial misconduct. Variations of this approach have been adopted by some of our sister states' high courts. *See e.g., State v. Rocha*, 890 N.W.2d 178 (Neb. 2017); *People v. Musser*, 835 N.W. 2d 319 (Mich. 2013); State v. O'Brien, 857 S.W.2d 212 (Mo. 1993); *but see State v. Demery*, 30 P.3d 1278 (Wa. 2001).

Applying our rules of evidence herein, particularly Rules 401 and 403, we decline to find that the admission of the above-noted statements constituted an abuse of discretion such that a new trial is warranted. The evidence presented to the jury in the form of the interrogation video was relevant to determining whether Malcolm was guilty of the offenses charged and to assess his credibility. We cannot say that the danger of these statements exceeded their probative value. Not only did the jury hear the contested

statements, but it also heard Malcolm's repeated and unwavering assertions of innocence. In addition, the jury was clearly instructed on multiple occasions that it was the ultimate factfinder and arbiter of credibility, and the jury was presumed to follow that instruction. *Commonwealth v. Jones*, 289 A.3d 959, 1009 (Pa. 2023) (explaining "[a] jury is presumed to follow instructions the trial court provides").

Additionally, although we do not find waiver in this case, it is important to note that defense counsel made – at best – two to three broad and nonspecific objections during the entirety of the interrogation video being presented to the jury but nevertheless challenges thirteen statements on appeal. Thus, despite now asserting that the admission of these statements was so egregious as to warrant a new trial, counsel's failure to object robbed the trial court of a complete opportunity to consider specific statements or provide a curative instruction beyond that which it did provide. This said, we do find the trial court's instructions sufficient. During the course of the video being played, the trial court paused the video shortly after it began and instructed the jury:

> We are going to stop this here. I don't know how many times he will say this and nobody told me but, ladies and gentlemen, for our purposes, **all you can consider is there is one person that came in and said that that was [Malcolm] on that video, and that was the police officer who testified yesterday.** So[,] the detective telling him people, plural, you are to disregard any of that. He is a detective. He is doing an interview. Sometimes –
>
> . . .
>
> There is a person who made an identification in the video. It was the witness who testified. It was a police officer. So[,] the detective is doing an interview and that is how the detective interviews go sometimes but forget the people, police. **You can only rely on what came from the witness stand. That was one police officer you heard.** Will [the video] keep doing this because no one told me he will say people?

N.T. Trial Vol. 4, 3/24/22, at 29-31. This instruction informed the jury that it was the ultimate factfinder. The trial court further emphasized that the jury was not to consider any information that either detective or any other individual, identified Malcolm as the

suspect in the video. The trial court was clear that the only witness who was able to identify Malcolm from the video was Officer Lamanna. It logically follows that any assertion by Detectives Burns or Harkins that Malcolm was indeed the person in the surveillance video was not to be considered.

We further observe that Malcolm's attorney had ample opportunity to probe Detective Burns and Officer Lamanna on this topic during cross-examination. Indeed, Malcolm's attorney cross-examined Officer Lamanna as to the propriety of his identification. N.T. Trial Vol. 3, 3/23/22, at 41-52. He additionally confronted Detective Burns about the use of false information during the interrogation as a means of obtaining accurate information, inquiring:

> [Defense Counsel]: During that time period, we heard and saw the video, that there were questions you were asking of [Malcolm] and him giving answers. In terms of the video that we saw of this interview, there was some questions about people at the scene had said it was him. You had no information of that at that time [of the interview], correct?
>
> [Detective Burns]: Not people, plural.
>
> [Defense Counsel]: That's what I am talking about?
>
> [Detective Burns]: Person.
>
> [Defense Counsel]: So, in essence, it is a technique that you utilize, you use some information that was inaccurate to see if you can get some information from [Malcolm] that may be accurate; correct?
>
> [Detective Burns]: That's right.
>
> [Defense Counsel]: So[,] all during that time, all that attempt by you to give information that may or may not be accurate, trying to get him to say something that was, in your mind, to you [sic] put him there as part of the homicide. He kept saying, no, it's not me. No, it's not me. No, it's not me. Right? I went through the transcript, went through this video, the entire video. He's saying it's not me. I didn't do it and he kept saying it for almost 72 times, 72 times and you, guys, were still there, asking him the same questions over and over again. Am I correct about that?

N.T. Trial Vol. 4, 3/24/22, at 115-117. In so doing, defense counsel was able to convey to the jury that despite being faced with inaccurate information, Malcolm was steadfast in maintaining his innocence. Then, during the Commonwealth's redirect, when Detective Burns was shown screenshots of the surveillance video, the trial court again explained to the jury: "[Y]ou are the finder of facts[, s]o it doesn't matter what the detective believes he sees in the picture." *Id.* at 138. Lastly, in its final charge, the trial court again reminded the jury of its responsibility to "consider and weigh the testimony of each witness and give it such weight and importance as in your judgment [it] is fairly entitled to receive[.]" N.T. Hearing Vol. 1, 3/25/22, at 137-38. Based on the foregoing, we decline to find that the contested statements were so prejudicial as to warrant a new trial.[12, 13]

---

[12] Because we decline to assign error to the admission of the detectives' statements in this case, it is not necessary to address the issue of harmless error.

[13] In a concurring opinion, Justice McCaffery states that today's decision implicitly suggests "that improperly admitted lay opinion testimony regarding the credibility of a defendant can be alleviated by a curative or cautionary instruction." McCaffery, J., Concurring Op. at 1. We disagree that such a broad pronouncement is implicit in our decision and emphasize that our conclusion is limited to the unique set of facts before us.

The concurrence goes on to disagree with our relevancy assessment of the at-issue statements. As explained above, we find these statements relevant to assessing Malcolm's credibility. However, even assuming the statements were only marginally relevant, exclusion is not required unless the probative value of the evidence is outweighed by a danger of, *inter alia*, unfair prejudice. *See* Pa.R.E. 403. Our decision hinges on this assessment. While we find that the curative instruction in this case did ameliorate any potential prejudice, so too did the jury's ability to hear Malcolm's responses to the detectives' questions. Malcolm also had ample opportunity to cross-examine Detective Burns about the statements, as well as Detective Lamanna about the propriety of his identification. These factors, in addition to Malcolm's minimal efforts at excluding these now purportedly improper statements does not convince us that a new trial is warranted.

In his dissent, Justice Wecht similarly disagrees with our relevancy analysis and opines that, even assuming the detectives' statements are marginally relevant, they are highly (…continued)

We agree that, in some cases, accusatory statements made by police officers could prove to be so prejudicial that exclusion is warranted. Where this is the case, we recommend resolving questions regarding admissibility through the filing of motions *in*

---

prejudicial. Wecht, J. Dissenting Op. at 5. In so arguing, the dissent criticizes our decision not to extend the line of cases concerning prosecutorial misconduct for improper bolstering to the instant scenario. It asserts that the "danger of unfair prejudice" is the same regardless of whether the evidence "comes in through a prosecutor or a police detective," placing great weight on the detectives' appearance of authority and superiority as impacting the jury's assessment of the value of the statements. *Id.* at 8-11. The dissent has not cited, nor has our research uncovered, any caselaw extending the line of cases concerning prosecutorial misconduct to similar statements made by police officers based on those reasons highlighted by the dissent.

The dissent's final critique involves our approval and assessment of the trial court's curative instructions. The dissent questions whether the erroneous admission of prejudicial opinion evidence is susceptible to cure via trial court instruction. *Id.* at 11. It alternatively contends that the trial court's specific instruction here "in no way addressed, let alone cured, the clear prejudice that attended the detectives' assertions regarding guilt and lack of credibility." *Id.* at 12.

Although limited, our caselaw appears to directly contradict this position. *See Commonwealth v. Ramos*, 231 A.3d 955 (Pa. Super. 2020) (concluding jury was presumed to follow trial court's instruction to disregard unsolicited remark of detective commenting on credibility of complainant). The dissent also fails to recognize that in the context of vouching claims, which it finds analogous to the circumstances herein, curative instructions have also been utilized to ameliorate prejudice. *See e.g.*, *Commonwealth v. Hernandez*, 230 A.3d 480 (Pa. Super. 2020) (holding trial court's issuance of curative instruction removed any danger of prejudice from alleged prosecutorial misconduct whereby prosecutor vouched for credibility of police officer in closing argument); *Commonwealth v. Collins*, 70 A.3d 1245, 1254 (Pa. Super. 2013) (finding trial court's curative instruction sufficient to cure prejudice regarding prosecutor's remark during closing argument stating that a witness had "told the truth").

As for the sufficiency of the trial court's instruction, notably absent from the dissent's critique is an acknowledgment that any purportedly lackluster instruction was the direct result of Malcolm's failure to request a specific instruction or clearly object to the statements now being contested. Notwithstanding the foregoing, we believe the instruction sufficiently informed the jury of its role in assessing witness credibility and the value, or lack therof, that should be placed on the detectives' statements.

*limine*.[14]  A pretrial ruling regarding the admissibility of information contained in a police interview allows the trial court to shield the jury from harmful information before it is presented and avoid last-minute attempts to cure any negative effects mid-trial.  Where the parties do not file pretrial motions, we find it necessary to remind defense counsel that it is of the utmost importance to lodge a specific and timely objection.  We are confident that where this occurs, our trial courts are more than capable of assessing contested statements under our existing rules of evidence.  We agree with both parties that redactions and curative instructions should also be utilized, but as these issues will likely need to be assessed on a case-by-case basis, we decline to implement any specific procedures at this time.

## VI. Conclusion

We decline to adopt the Superior Court's decision in *Kitchen* and instead hold that our existing rules of evidence regarding relevancy should continue to be applied in determining the admissibility of accusatory statements made by police in interrogation videos.  We therefore affirm the Superior Court's order denying Malcolm's request for a new trial.

Justice Brobson joins the opinion announcing the judgment of the Court.

Justice McCaffery files a concurring opinion in which Justice Dougherty joins.

Justice Wecht files a dissenting opinion in which Chief Justice Todd and Justice Donohue join.

---

[14] This was the manner in which the statements in *Kitchen* were challenged.  Though we do not adopt the substances of *Kitchen*, it is clear from that case that proceeding via a motion *in limine* provided both the trial court and the intermediate court with more robust arguments in considering the admissibility of the contested statements.